ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAY 4 2005
U.S. COURT OF FEDERAL CLAIMS

**AMERICAN RENOVATION AND CONSTRUCTION COMPANY,**

**Plaintiff,**

**CLASSICAL FINANCIAL SERVICES, LLC,**

**Intervenor,**

**v.**

**UNITED STATES OF AMERICA,**

**Defendant.**

**NO. 1:03-CV-01798-EJD**

---

**INTERVENOR'S COMPLAINT**

---

COMES NOW Intervenor Classical Financial Services, LLC ("Classical Financial" or "Intervenor"), by and through its undersigned counsel, and as its Intervenor's Complaint in the above-styled matter shows the Court the following:

**FACTUAL ALLEGATIONS**

**A. Plaintiff's Claim Against the Government**

1. On or about March 31, 1999, Plaintiff American Renovation and Construction Company ("ARC" or "Plaintiff") entered into a contract (Contract No. F08602-99-CK006; hereinafter, the "Contract") with Defendant United States of America, Department of the Air Force (the "Government") for the provision of construction services on a project known as Construct JNCO Family Housing Units, Phases III and IV, MacDill Air Force Base, Florida (the "Project").

2. On or about July 28, 2003, Plaintiff filed the above-captioned action against the Government asserting claims for damages arising out of the Contract. Plaintiff's Complaint asserts separate counts for breach of contract, wrongful default termination, and wrongful termination and seeks damages in an unspecified amount. A true and correct copy of Plaintiff's Complaint is attached hereto as Exhibit "A" and incorporated herein by reference.

**B. Intervenor's Loan to Plaintiff**

3. On or about July 15, 1996, Plaintiff and Classical Receivables Funding Company, LLC ("Classical Receivables" or "Lender"), as predecessor-in-interest of Intervenor, entered into a written loan agreement (the "Loan Agreement") whereunder Classical Receivables agreed to advance funds to Plaintiff from time to time (the "Loan") in accordance with the terms of the Loan Agreement and related documents. A true and correct copy of the Loan Agreement is attached hereto as Exhibit "B" and incorporated herein by reference.

4. Pursuant to the Loan Agreement, Classical Receivables advanced funds to Plaintiff over a period of several years, and Plaintiff executed and delivered a series of promissory notes evidencing Plaintiff's indebtedness to Classical Receivables, including without limitation a promissory note in the amount of $2,000,000 dated July 15, 1996, a note in the amount of $7,500,000 dated August 24, 1998, and a note in the amount of $15,000,000 dated August 17, 1999 (collectively, the "Notes"). True and correct copies of the 1998 and 1999 Notes are attached hereto as Exhibits "C" and "D" and incorporated herein by reference.

5. To secure its obligations under the Loan Agreement and Notes, Plaintiff executed and delivered to Classical Receivables an Assignment and Security Agreement (the "Assignment and Security Agreement"). A true and correct copy of the Assignment and Security Agreement is attached hereto as Exhibit "E" and incorporated herein by reference.

6. In paragraph 1 of the Assignment and Security Agreement, ARC assigned to Classical Receivables and granted Classical Receivables a security interest in all of its right, title and interest in, *inter alia*, the following: (a) certain contracts with third parties, including without limitation all amounts due to Classical Receivables through claims for breach of contract; (b) accounts receivable and all other rights to payment of money which arise from contracts for the sale of goods or services; (c) all general intangibles of Plaintiff, including without limitation choses in action and causes of action; and (d) the proceeds of the above-referenced collateral, including recoveries due by reason of payment, collection or settlement.

7. The above-described security interest applies to Plaintiff's interest in the Contract and any proceeds or receivables based thereon and Plaintiff's causes of action asserted in this lawsuit, including any recovery therefrom through whatever means.

8. On or about August 22, 1999, Classical Receivables assigned to Intervenor all right, title and interest in the Loan Agreement, Notes and Assignment and Security Agreement (the "Assignment of Loan Documents"). A true and correct copy of the Assignment of Loan Documents is attached hereto as Exhibit "F" and incorporated herein by reference. Intervenor is therefore the successor-in-interest to Classical Receivables with respect to the Loan and all documents, agreements and security interests relating thereto.

9. As an inducement for Intervenor to advance additional funds to Plaintiff under the Loan Agreement, on or about September 16, 1999, Plaintiff assigned to Intervenor all of its right, title and interest to all payments and proceeds owing from the Government under the Contract (the "Instrument of Assignment"). A true and correct copy of the Instrument of Assignment is attached hereto as Exhibit "G" and incorporated herein by reference.

C. **Plaintiff's Default on the Loan and Intervenor's Judgment Against Plaintiff**

10. Plaintiff defaulted under the terms of the Loan Agreement, Notes and Assignment and Security Agreement by, *inter alia*, failing to pay its indebtedness thereunder upon demand by Intervenor. Intervenor declared the Loan and all related documents to be in default, and said defaults have never been cured.

11. On or about May 2, 2000, Intervenor instituted a civil action against Plaintiff in the United States District Court for the Northern District of Georgia, styled Classical Financial Services, LLC v. American Renovation and Construction Company, Inc., et al., Civil Action File No.: 1:00-CV-1114-WBH (the "Georgia Lawsuit"), seeking, *inter alia*, damages for amounts Classical Financial claimed due and owing pursuant to the Loan Agreement and Notes.

12. On or about August 31, 2004, the Court in the Georgia Lawsuit entered a Final Consent Order and Judgment that included a money judgment against ARC and in favor of Intervenor on Intervenor's claim on the Note in the amount of $17,000,000.00 (the "Consent Judgment"). A certified copy of the Consent Judgment is attached hereto as Exhibit "H" and incorporated herein by reference.

**FIRST CAUSE OF ACTION**

**(Declaratory Judgment)**

13. Classical Financial incorporates by reference the allegations contained in paragraphs 1 through 12 of this Complaint as if fully set forth herein.

14. Under paragraph 1 of the Assignment and Security Agreement, Plaintiff granted to Classical Receivables a continuing security interest in all of its right, title and interest in ARC's causes of action pending before this Court in the present case and any proceeds thereof.

15. Pursuant to the Assignment of Loan Documents, Classical Receivables assigned all of its right, title and interest in the Notes and Assignment and Security Agreement to Intervenor.

16. Moreover, pursuant to the Instrument of Assignment, Plaintiff assigned to Classical Financial all of its right, title and interest to all payments or proceeds owing from the Government in connection with the Contract.

17. Accordingly, Intervenor now has a continuing security interest in all of Plaintiff's right, title and interest in the present matter including all rights to any payments or proceeds owed to ARC from the Government in connection with the Contract.

WHEREFORE, Intervenor respectfully requests that the Court adjudge that:

(a) Intervenor is the rightful owner by assignment of any award of damages to Plaintiff in this litigation;

(b) Intervenor is the rightful owner by assignment of the causes of action brought by Plaintiff in this litigation;

(c) Intervenor, as rightful owner of the causes of action and any award of damages, has all of the rights of ownership of the award of damages and the causes of action, including the right to litigate the issues pending before the Court and the right to settle the dispute without the consent or participation of Plaintiff;

(d) Intervenor be awarded its costs and attorney's fees; and

(e) Intervenor be awarded such other or further relief as the Court deems just or proper under the circumstances.

**SECOND CAUSE OF ACTION**

**(Alternative Declaratory Relief)**

18. Intervenor incorporates by reference the allegations contained in paragraphs 1 though 17 of the Complaint as if fully set forth herein.

19. Under paragraph 1 of the Assignment and Security Agreement, Plaintiff granted to Classical Receivables a continuing security interest in all of its right, title and interest in ARC's causes of action pending before this Court in the present case, and any proceeds thereof.

20. Pursuant to the Assignment of Loan Documents, Classical Receivables assigned all of its right, title and interest in the Notes and Assignment and Security Agreement to Intervenor.

21. Moreover, pursuant to the Instrument of Assignment, ARC assigned to Classical Financial all of its right, title and interest to all payments or proceeds owing from the Government in connection with the Project.

22. Accordingly, Intervenor now has a continuing security interest in all of Plaintiff's right, title and interest in the present matter including all rights to any payments or proceeds owed to Plaintiff from the Government in connection with the Contract.

WHEREFORE, Intervenor demands that the Court adjudge that:

(a) Intervenor has a continuing security interest in any award of damages to Plaintiff in this litigation;

(b) Intervenor has a continuing security interest in the causes of action brought by Plaintiff in this litigation;

(c) Intervenor has equitable ownership of the award of damages and the causes of action, including the right to litigate the issues pending before the Court and the right to settle the dispute without the consent or participation of Plaintiff;

(d) Intervenor be awarded its litigation costs and attorney's fees; and

(e) Intervenor be awarded such other and further relief as the Court deems just and proper under the circumstances.

**THIRD CAUSE OF ACTION**

**(Claim of ARC)**

23. Intervenor hereby incorporates the allegations contained in paragraphs 1 though 22 of the Complaint as if fully set forth herein.

24. Intervenor hereby incorporates paragraphs 1 through 66 of Plaintiff's Complaint in this action as if fully set forth herein.

25. Pursuant to the Assignment and Security Agreement, the Assignment of Loan Documents, the Instrument of Assignment, and the Consent Judgment, Intervenor is the legal and equitable owner of this cause of action and any award of damages issued thereon.

WHEREFORE, Intervenor requests that the Court adjudge that:

(a) Intervenor is the rightful owner by assignment of any award of damages to Plaintiff in this litigation;

(b) Intervenor is the rightful owner by assignment of the causes of action brought by Plaintiff in this litigation;

(c) Intervenor, as rightful owner of the causes of action and any award of damages, has all of the rights of ownership of the award of damages and the causes of action, including the right to litigate the issues pending before the Court and the right to settle the dispute without the consent or participation of Plaintiff;

(d) Intervenor have judgment against the Government in an amount to be determined at trial;

(e) Intervenor be awarded its costs and attorney's fees; and

(f) Intervenor be awarded such other or further relief as the Court deems just or proper under the circumstances.

Respectfully submitted this 3rd day of May, 2005.

William C. Collins, Jr.
Georgia Bar No. 178847
Kwende B. Jones
Georgia Bar No. 041155
Attorneys for Intervenor
Classical Financial Services, Inc.

BURR & FORMAN LLP
171 Seventeenth Street, N.W.
Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **INTERVENOR'S COMPLAINT** has been served on the following by directing same to their office addresses through first-class, United States mail, postage prepaid, on this the 3rd day of May, 2005:

Harish Chellaram Mirchandani
Watt, Tieder, Hoffar & Fitcgerals, LLP
7929 West Park Drive, Suite 400
McLean, VA 22102

Michael N. O'Connell, Jr.
U. S. Department of Justice
Commercial Litigation Branch
1100 L Street, N.W., A Floor
Washington, DC 20530

William C. Collins, Jr.
Georgia Bar No. 178847
Kwende B. Jones
Georgia Bar No. 041155

BURR & FORMAN LLP
171 Seventeenth Street, N.W.
Suite 1100
Atlanta, Georgia 30363
Telephone: (404) 815-3000
Facsimile: (404) 817-3244

#058280

ORIGINAL

ECF

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

FILED
JUL 2 8 2003
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| AMERICAN RENOVATION AND CONSTRUCTION COMPANY, Plaintiff, | Case No. 03-1798C |
| v. | |
| THE UNITED STATES OF AMERICA Defendant | |

## COMPLAINT

COMES NOW the Plaintiffs, American Renovation & Construction Company ("ARC" or "Plaintiff"), by counsel, and for their Complaint against the Defendant, United States of America, allege the following:

## JURISDICTION AND PARTIES

1. This Court has jurisdiction over this matter pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§601-613, and the Tucker Act, 28 U.S.C. §1491, et seq.

2. Plaintiff ARC is a corporation organized and existing under the laws of the State of California, with its principal place of business located in Encinitas, California.

3. The Defendant is the United States of America, acting through its agency, bureau, instrumentality and/or agent, the Department of the Air Force (the "Air Force" or the "Government").

4. The Government terminated for default Contract No. F08602-99-CK006 by a Contracting Officer's Final Decision, dated July 29, 2002 and received by ARC on the same date. Accordingly, this Complaint is timely filed by ARC within one year of receipt of the termination for default.

## FACTS

### Bid Solicitation and Contract

5. On or about January 22, 1999, the Government issued Bid Solicitation No. F0862-99-R0003 for a project known as: Construct JNCO Family Housing Units, Phases III and IV, MacDill AFB, Florida (the "Project"). The Project generally involved the construction of family housing units at the MacDill Air Force Base in two phases: the first phase (Phase III) was specified as a basic Contract requirement, with optional requirements for additional units, and the second phase (Phase IV) was contingent on the exercise of options by the Government.

6. The Bid Solicitation specified, *inter alia*, that the Project duration to perform the basic Contract requirements (Phase III) would be 365 days, subject to extension(s) of time as specified if the Government awarded ARC any of the optional requirements, including Phase IV of the Project.

7. On or about February 9, 1999, ARC attended a pre-proposal conference and site visit. In the minutes of the pre-proposal conference and site visit, the Contracting Officer confirmed, *inter alia*:

a. that Phases III and IV, if awarded, and any other optional requirements, would be performed sequentially, stating that

award of Phase IV by the Government "extends the performance an additional 365 calendar days and likewise award of additional requirements in line item 0004 extends performance as stated;" and

b. that the successful bidder would have no design responsibility on the Project, stating that "[t]his is a 100% designed project."

8. On or about March 4, 1999, in response to the Bid Solicitation, and in reliance on the plans and specifications provided by the Government and the Contracting Officer's statements at the pre-proposal conference and site visit, ARC submitted a bid to perform the Project for the lump sum amount of $6,233,629.00 for the basic requirement, plus additional lump sum amounts for each of the optional requirements, if awarded by the Government.

9. On or about March 31, 1999, the Government accepted ARC's bid as the lowest responsible and responsive bid.

10. On or about March 31, 1999, ARC entered into Contract Number F08602-99-CK006 with the Government in the base amount of $6,233,629.00 (the "Contract").

11. The Contract included, *inter alia*, the following standard form clauses set forth in the Federal Acquisition Regulations ("FAR"):

a. 52.211-10, "Commencement, Prosecution and Completion of Work" (APR 1984);

b. 52.211-13, "Time Extensions" (APR 1984);

c. 52.233-1, "Disputes" (DEC 1998);

d. 52.243-4, "Changes" (AUG 1987);

e. 52.249-2, "Termination for Convenience of the Government (Fixed-Price)" (SEP 1996) – Alternate I (SEP 1996);

f. 52.249-10, "Default (Fixed-Price Construction)" (APR 1984).

12. Under FAR 52.211-10, the Contract specified a duration of 365 calendar days for the basic requirements, plus additional calendar days as specified if any of the optional requirements under Phase III of the Project were awarded to ARC, plus an additional duration of 365 days if Phase IV of the Project was awarded to ARC, plus additional calendar days as specified if any of the optional requirements under Phase IV of the Project were awarded to ARC.

13. Under FAR 52.249-10(b), the Contract permitted the Government to terminate ARC's right to proceed, provided just cause existed.

14. FAR 52.249-10(c) provided a remedy in the event the Government wrongfully terminated ARC for default, stating:

> If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

**Contract Performance**

15. The Government issued a Notice to Proceed with Phase III of the Project on or about August 11, 1999. Pursuant to the Contract, ARC was required to substantially complete Phase III of the Project by August 11, 2000.

***Contract Modifications***

16. Between August 11, 1999 and March 31, 2000, the Government issued Contract Modification Nos. 1 through 8 whereby, *inter alia*, the Government and ARC mutually agreed to extend the Contract completion date to June 5, 2001.

17. On or about March 31, 2000, the Government exercised its option to award ARC Phase IV of the Project, including one of the optional requirements under Phase IV. Accordingly, the Contract allowed ARC an additional duration of 395 calendar days, or until July 5, 2002, to substantially complete the Project.

18. By unilateral Contract Modification No. 9, however, the Government directed ARC to substantially complete the Project scope of work, as modified, by August 24, 2001. The Government provided no justification for reducing the Contract-mandated duration by more than ten (10) months.

19. Thereafter, the Government and ARC executed additional Contract Modifications for direct cost increases due to Government-directed changes in ARC's scope of work. The parties, however, agreed to defer negotiation of related time extensions and delay damages until a later date, pending ARC's submission of a consolidated request for equitable adjustment.

20. By unilateral Contract Modification No. 13, the Government purported to extend the Contract completion date by 60 calendar days, but in fact indicated a revised completion date of August 4, 2001.

21. By unilateral Contract Modification No. 15, the Government revised the Contract completion date to July 1, 2002, in response to ARC's January 2001 request for equitable adjustment.

***Design Deficiencies***

22. The Contract required ARC to construct one model of each type of housing unit, for the primary purpose of enabling the Contracting Offier to select material finishes and color.

23. ARC also reasonably expected to establish the learning or experience curve for the buildings during construction of the model units.

24. Notwithstanding express and implied representations in the Contract that the Project was "100% designed," ARC uncovered deficiencies in almost every aspect of the design during construction of the model units.

25. Government representatives acknowledged contemporaneously that the Project was severely deficient and the Government directed ARC to design-build the Project, using the Contract documents "for reference only."

26. Several of the design deficiencies that were uncovered during construction of the model units are exemplified by numerous Requests for Information ("RFI") that ARC issued on the Project.

27. The cumulative impact of the design deficiencies was exacerbated by the Government's failure to respond timely to many of the RFIs. In some instances, the Government responded several months after ARC issued the RFIs.

28. In addition to the design issues that were addressed specifically in RFIs and other correspondence, the Government and ARC resolved a number of design errors through as-built field changes to the model units.

29. The RFIs and field changes impacted almost every trade involved in the construction of each of the model units.

30. The process of redesigning the Project in the field, as the construction work progressed, caused numerous disruptions on a daily basis, resulting in significant delays and increased costs.

31. The Contract specified, *inter alia*, the gross and net areas of each type of housing unit included in the Project scope of work. The areas, as specified, were consistent with statutory size requirements for Air Force housing units.

32. ARC relied reasonably on the express Contract representations regarding the size of the housing units in preparing its bid estimate for the work.

33. The actual size of the housing units was significantly greater than the specified gross areas and the applicable statutory limits, causing ARC to expend additional time and money to perform the increased scope of work.

34. The change in the nature of the Project, from "100% designed" to "design-build" type construction precluded ARC from, *inter alia*, progressing the work in an efficient and productive manner and made it especially difficult for ARC to retain and/or hire qualified workers in adequate numbers.

35. The loss of productivity, proximately caused due to the change by the Government in the nature of the Project to design-build type construction,

was exacerbated by a severe shortage of construction labor in the Tampa Bay area, where the Project is located.

36. ARC notified the Government of the increased costs and delays, proximately caused by the Government's directive to design-build the Project and compounded by the labor shortage in the area, as well as the measures ARC was taking to mitigate some of the delays and damages.

***Change in Site Access Procedures***

37. On or about September 13, 2001, the Government issued a directive, subsequently incorporated in unilateral Contract Modification No. 16, imposing "stricter security requirements" for personnel and materials to access the Project site.

38. ARC notified the Government of the impact due to the heightened security requirements, including a significant loss of manpower, increased wage rates, loss of labor productivity, increased material procurement costs, and additional delays.

**ARC's Requests for Equitable Adjustment**

39. In or about January 2001, ARC submitted to the Contracting Officer a request for equitable adjustment of the Contract, including a time extension by 210 days and additional compensation, primarily due to deficiencies in the design furnished by the Government.

40. Following an audit of ARC's costs by the DCAA, the Contracting Officer made a settlement offer to ARC, by letter dated December 10, 2001. In the December 10, 2001 letter, the Contracting Officer allowed for ARC to

supplement its claim for additional delays and costs incurred since the January 2001 submission of ARC's request for equitable adjustment and to provide an acceptable schedule and delay analysis using the Critical Path Method ("CPM") of scheduling.

41. By letter dated July 26, 2002, ARC submitted its amended request for equitable adjustment, including additional delays and costs incurred since the January 2001 submission of ARC's request for equitable adjustment, as well as a CPM schedule and delay analysis, as requested by the Contracting Officer. In the amended submission, ARC requested, *inter alia*, compensation for 529 calendar days of delay caused by the Government and an extension of the Contract completion date until February 4, 2003.

**Cure Notice, Termination and Surety Takeover**

42. Recognizing the financial burden on ARC due to uncompensated delays and increased costs attributable to the Government, ARC's performance and payment bond surety, St. Paul Fire and Marine Insurance Company ("St. Paul" or the "Surety"), took measures to protect its own interests and the interests of the Government, by providing financial and management assistance to ARC, starting in July 2001.

43. On or about December 10, 2001, almost one year after ARC submitted its request for equitable adjustment, the Government Contracting Officer made an offer to settle ARC's request for a fraction of ARC's delay damages.

44. Immediately following the Contracting Officer's settlement offer, St. Paul offered to take over the Project pursuant to a proposed voluntary default by ARC and St. Paul forwarded to the Government the draft of a proposed Takeover Agreement.

45. The Government failed to respond meaningfully to St. Paul's proposed Takeover Agreement in a timely manner.

46. Approximately three months after St. Paul's proposal to take over the Project, the Government issued a "Cure Notice" to ARC, dated March 12, 2002, stating that the Government may terminate for default within 10 days after receipt of the cure notice.

47. ARC and St. Paul responded jointly to the cure notice, in writing, *inter alia* urging the Government to expedite execution of the proposed Takeover Agreement. Representatives of ARC and St. Paul also met with Government representatives to discuss the cure notice and St. Paul's proposed Takeover Agreement.

48. On the morning of July 29, 2002, the Government received delivery of ARC's amended request for equitable adjustment, establishing ARC's entitlement to additional time extensions and compensation for increased costs on the Project.

49. On the afternoon of July 29, 2002, the Government issued a Contracting Officer's Final Decision, terminating the Contract for default. The Final Decision was hand delivered to ARC on the same day.

50. As of July 29, 2002, ARC had established its entitlement to a time extension until February 4, 2003, supported by detailed schedule and delay analysis, documentation of increased costs, and other exhibits. In its transmittal of the request for equitable adjustment, ARC also proposed a meeting with the Government Contracting Officer to discuss the issues addressed in the request and achieve a negotiated settlement of the request for equitable adjustment.

51. The Government failed to meaningfully review ARC's request for equitable adjustment prior to terminating the Contract.

52. ARC fulfilled all of its material obligations under the Contract and performed in a proper manner.

53. On or about August 1, 2002, the Government executed a Takeover Agreement with St. Paul, as proposed earlier by St. Paul in December 2001.

## COUNT I

## (Breach of Contract – Wrongful Termination)

54. ARC incorporates by reference the allegations contained in paragraphs 1 through 53 of this Complaint as if set forth fully herein.

55. Pursuant to the Contract and applicable law, the Government had a duty and obligation to, *inter alia*:

a. timely provide complete and accurate plans and specifications for the Project;

b. administer, coordinate and manage the Contract in a competent, proper and timely manner consistent with the terms and conditions of the Contract; and

c. not unreasonably delay, interrupt, obstruct, or otherwise hinder ARC's performance of its Contract work.

56. The Government failed to perform all of its obligations under the Contract and applicable law and materially breached the Contract by, *inter alia*:

a. failing to timely provide ARC with complete and accurate plans and specifications for the Project;

b. unreasonably withholding and/or delaying approval or response to ARC's submittals, RFIs and other submissions;

c. failing to grant time extension(s) for changes, excusable and compensable delays, extra work and other unforeseen matters beyond the control and without the fault of ARC;

d. failing and/or refusing to make reasonable efforts to promptly and equitably resolve disputes and change order proposals;

e. delaying and/or interfering with ARC's performance of the Contract work;

f. failing to exercise reasonable discretion in its decision to terminate the Contract; and

g. failing to otherwise honor the terms and conditions of the Contract.

57. The Government's material breaches of its contractual obligations extinguished any contractual right it may have had to terminate ARC's Contract for default. Accordingly, the default termination by the Government was wrongful.

58. As a direct and proximate result of the Government's wrongful termination of the Contract, ARC has sustained substantial damages. Moreover, ARC's performance of the Contract work was delayed, disrupted and otherwise impacted as a direct and proximate result of the Government's wrongful termination and material breaches of the Contract.

WHEREFORE, ARC respectfully requests that this Court enter judgment against the Government on Count I of this Complaint, set aside the termination for default, convert said termination into a termination for Convenience of the Government, and award ARC all relief provided under the Contract and applicable laws and regulations, to include attorney's fees, costs and such other relief as the Court deems proper.

**COUNT II**

**(Wrongful Default Termination)**

59. ARC incorporates by reference the allegations contained in paragraphs 1 through 58 of this Complaint as if set forth fully herein.

60. The Government wrongfully terminated ARC when the Government, *inter alia*:

a. failed to timely provide ARC with complete and accurate plans and specifications for the Project;

b. unreasonably withheld and/or delayed approval or response to ARC's submittals, RFIs and other submissions;

c. failed to grant time extensions for changes, excusable and compensable delays, extra work and other unforeseen matters beyond the control and without the fault of ARC;

d. failed and/or refused to make reasonable efforts to promptly and equitably resolve disputes and change order proposals;

e. delayed and/or interfered with ARC's performance of the Contract work;

f. failed to exercise reasonable discretion in its decision to terminate the Contract; and

g. failed to otherwise honor the terms and conditions of the Contract.

61. The acts and/or omissions of the Government set forth above also caused ARC to suffer excusable and compensable delays.

62. As a direct result of the Government's acts and/or omissions, ARC sustained substantial damages. Moreover, ARC's performance of the Contract Work was delayed, disrupted and otherwise impacted as a direct result of the Government's acts and/or omissions.

WHEREFORE, ARC respectfully requests that this Court enter judgment against the Government on Count II of this Complaint, set aside the termination for default, convert said termination into a termination for Convenience of the Government, and award ARC all relief provided under the Contract and applicable laws and regulations, to include attorney's fees, costs and such other relief as the Court deems proper.

**COUNT III**

**(Wrongful Termination)**

63. ARC incorporates by reference the allegations contained in paragraphs 1 through 62 of this Complaint as if set forth fully herein.

64. Notwithstanding the Government's acts, omissions and/or breaches of Contract described above, as of July 29, 2002, ARC had the ability to complete, and planned to complete, the remaining Contract work by the unadjusted Contract substantial completion date, as indicated in ARC's amended request for equitable adjustment.

65. Notwithstanding ARC's ability to complete the remaining Contract work in accordance with the Contract requirements, the Government terminated the Contract for default. Accordingly, the Government's termination of the Contract for default was wrongful.

66. As a direct and proximate result of the Government's wrongful termination of the Contract, ARC has sustained substantial damages.

WHEREFORE, ARC respectfully requests that this Court enter judgment against the Government on Count III of this Complaint, set aside the termination for default, convert said termination into a termination for Convenience of the Government, and award ARC all relief provided under the Contract and applicable laws and regulations, to include attorney's fees, costs and such other relief as the Court deems proper.

Respectfully submitted this 28th day of July, 2003.

AMERICAN RENOVATION AND
CONSTRUCTION COMPANY

By Counsel:

Robert G. Watt
Watt, Tieder, Hoffar & Fitzgerald, LLP
7929 Westpark Drive, Suite 400
McLean, Virginia 22102
Ph: (703) 749-1000
Fax: (703) 893-8029
rwatt@wthf.com

EXHIBIT B

00273126

# CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C.

## Government Receivables Financing Program

## LOAN AGREEMENT

dated as of

July 15, 1996

| | |
|---|---|
| LENDER: | Classical Receivables Funding Company, L.L.C., a Tennessee limited liability company |
| BORROWER: | American Renovation & Construction Company |
| BORROWER ENTITY TYPE: | Corporation |
| BORROWER JURISDICTION: | California |
| BORROWER'S ADDRESS (CHIEF EXECUTIVE OFFICE): | 3645 Camino Del Rio South<br>San Diego, California 92108-4004<br>Attention: Kimberly K. McMahon, Treasurer<br>Telecopy No.: (619) 284-8120 |
| GUARANTOR(S): | Ivan Velasquez, Anthony P. Dethloff, Kimberly K. McMahon, Francis N. Todd, II, Blanche Richardson and Anthony J. Jemison |
| COMMITMENT DATE: | April 26, 1996 |
| COMMITMENT ACCEPTANCE DATE: | May 22, 1996 |

| | |
|---|---|
| INITIAL COMMITMENT AMOUNT: | U.S. $2,000,000 |
| INITIAL MANAGEMENT FEE: | U.S. $343,583.00 |
| ADVANCE RATE: | ninety percent (90%) |
| COMMITMENT TERMINATION DATE: | August 22, 1997 |

**DATE OF LATEST FINANCIAL STATEMENTS:** April 30, 1996

**INTEREST RATE:**

Variable rate of two percent (2.0%) per annum above the prime rate for commercial loans as announced or quoted from time to time by First Union National Bank of North Carolina from its principal offices in Charlotte, North Carolina (the "Prime Rate"), computed on the basis of the actual number of days elapsed over a year of 360 days.

**LOAN PERIOD COMMENCEMENT DATE(S):** The 15th day of each calendar month.

**PROCESSING AND ADMINISTRATION FEE:** $75.00 per Request for Advance.

**SERVICER:** Classical Receivables Funding Company, L.L.C.

**SERVICER'S ADDRESS:**

4646 Poplar Avenue
Suite 213
Memphis, Tennessee 38117-4432
Attn: Dennis R. Terhune, Operating Manager
Facsimile No.: (901) 682-6022

**THIS LOAN AGREEMENT** is made by and between Borrower and Lender identified on the cover page hereof.

**FOR AND IN CONSIDERATION** of the sum of Ten and No/100 Dollars ($10.00) in hand paid, the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

## ARTICLE 1. Definitions.

For the purposes of this Agreement, the terms *"Lender"*, *"Borrower"*, *"Borrower Entity Type"*, *"Borrower Jurisdiction"*, *"Borrower's Address"*, *"Guarantor"*, *"Commitment Date"*, *"Commitment Acceptance Date"*, *"Initial Commitment Amount"*, *"Initial Management Fee"*, *"Advance Rate"*, *"Commitment Termination Date"*, *Date of Latest Financial Statements"*, *"Loan Period Commencement Date(s)"*, *"Processing and Administration Fee"*, *"Servicer"*, *and "Servicer's Address"* shall have the meanings set forth on the cover page hereof, and, unless the context otherwise requires, the terms defined in this Section shall for all purposes of this Agreement have the following meanings:

*"Account"* shall mean any right to payment for goods sold or leased or for services rendered or for expenses incurred or advanced which is not evidenced by an instrument or chattel paper, whether or not earned by performance.

*"Account Debtor"* shall mean any Person who is or may become obligated in respect of an Account.

*"Additional Management Fee"* shall mean any Management Fee as shall become payable by Borrower hereunder from time to time other than the Initial Management Fee, as shall be set forth in a Supplemental Commitment Letter.

*"Advance"* or *"Advances"* shall mean the amount advanced by Lender to Borrower as proceeds of the Loan pursuant to Article 2 hereof on the occasion of any borrowing to fund performance by Borrower of a Designated Contract.

*"Agreement"* shall mean this Agreement.

*"Agreement Date"* shall mean the date as of which this Agreement is dated, as set forth on the cover page hereof.

*"Applicable Law"* shall mean in respect of any Person, all provisions of constitutions, statutes, rules, regulations and orders of governmental bodies or regulatory agencies applicable to such Person, and all orders and decrees of all courts and arbitrators in

proceedings or actions to which the Person in question is a party or by which such Person or its properties are bound.

*"Assignment"* shall mean the Assignment and Security Agreement dated as of the Agreement Date, from Borrower to Lender and assigned by Lender to the Collateral Trustee, in form and substance approved by Lender.

*"Assignment of Claims Act"* shall mean the federal Assignment of Claims Act of 1940 (31 U.S.C. Section 203 et seq., as amended).

*"Authorized Signatory"* shall mean such senior personnel of Borrower as may be duly authorized and designated in writing by Borrower to execute documents, agreements and instruments on behalf of Borrower.

*"Borrowing Base"* shall mean, at any date of the determination thereof, an amount equal to the lesser of (a) the amount of the Commitment, or (b) an amount equal to the product of the Advance Rate multiplied by the net amount of Eligible Receivables. For purposes hereof, the net amount of Eligible Receivables of Borrower at any time shall be the face amount of such Eligible Receivables less any and all returns, rebates, discounts (which may, at Lender's option, be calculated on shortest terms), sales taxes, credits, allowances or excise taxes of any nature at any time issued, owing, claimed by the Account Debtors, granted, outstanding or payable in connection with such Eligible Receivables at such time.

*"Borrowing Base Certificate"* shall mean a certificate signed by an Authorized Signatory certifying to Lender the Borrowing Base as of a specific date, in substantially the form of Exhibit A hereto attached and incorporated herein by this reference or in such other form and detail as Lender shall hereafter approve from time to time.

*"Business Day"* shall mean any day other than a Saturday, Sunday or other day on which banks are required or authorized by law to remain closed in Atlanta, Georgia.

*"Collateral"* shall mean and include all Property of Borrower, whether now owned or hereafter acquired by Borrower or in which Borrower has or hereafter acquires any interest, with respect to which Lender has, or is entitled or intended to have, a Lien pursuant to the terms of the Loan Documents.

*"Collateral Trust Agreement"* shall mean the Collateral Trust and Collection Agency Agreement dated as of July 15, 1996, between Lender, the Collateral Trustee and the Funding Source therein named, as amended and supplemented. In the event that the Loan shall hereafter be assigned to a trustee under an agreement other than the Collateral Trust and Collection Agency Agreement referred to in the foregoing sentence (including without limitation the Master Collateral Agreement dated as of August 15, 1995, between Lender and the Collateral Trustee), the term "Collateral Trust Agreement" shall be deemed hereafter to refer to such subsequent Trust Agreement, and if the Trustee thereunder is other

than Reliance Trust Company, the Trustee serving as such under such subsequent Agreement shall be deemed to be the successor to Reliance Trust Company as the Collateral Trustee within the meaning of this Agreement.

"*Collateral Trustee*" shall mean Reliance Trust Company, a Georgia bank having trust powers, in its capacity as the collateral trustee under the Collateral Trust Agreement, and its successors and assigns as the collateral trustee thereunder.

"*Commitment*" shall mean the obligation of Lender to make a Loan to Borrower in an aggregate principal amount not to exceed the Commitment Amount, subject to the terms and conditions hereof.

"*Commitment Amount*" shall mean the Initial Commitment Amount as it may be adjusted from time to time by amendment to this Agreement.

"*Commitment Letter*" shall mean the commitment letter from Lender to Borrower dated the Commitment Date and accepted by Borrower and the Guarantor on the Commitment Acceptance Date pursuant to which Lender shall have committed to provide the financial accommodations described herein to Borrower.

"*Commitment Termination Date*" shall mean the date identified as such on the cover page hereof, as such date may be extended from time to time at the option of Lender, or such earlier date as the Commitment shall be terminated as provided herein..

"*Default Rate*" shall mean a per annum interest rate equal to the interest rate set forth on the cover page hereof, plus five (5.0) percentage points.

"*Designated Contract*" shall mean a contract for sale or lease of goods or for services to be rendered between Borrower and the United States of America or any department, agency or instrumentality thereof which is identified as a Designated Contract under the Assignment or any supplement thereto.

"*Effective Advance Date*" for any Advance shall be the Loan Period Commencement Date next preceding the date of such Advance, unless the date of such Advance is a Loan Period Commencement Date, in which case the Effective Advance Date shall be the date of such Advance.

"*Effective Credit Date*" for repayment of the Loan in whole or part shall be the last day of the Loan Period when such repayment is received by Lender.

"*Eligible Receivable*" shall mean an Account arising under a Designated Contract in the ordinary course of Borrower's business, in which the Collateral Trustee has a first-priority Lien therein for the benefit of Lender pursuant to the Loan Documents, and as to which (i) Borrower shall have assigned its right to payment of such Account to the Collateral

Trustee or other designee of Lender, in a manner satisfactory to Lender, so as to comply with the Assignment of Claims Act; (ii) the Account shall have been approved for payment in writing by a supervisory federal officer on behalf of the Account Debtor; and (iii) the Collateral Trustee shall have received evidence of such approval for payment and the authority of the person executing such approval satisfactory to Lender. Without limiting the generality of the foregoing, no Account of Borrower shall be an Eligible Receivable (and any Account which was formerly an Eligible Receivable shall cease to be such) if:

(a) It is unpaid for more than seventy-five (75) days after the original due date shown on the related invoice;

(b) It is due or unpaid more than one hundred five (105) days after the original invoice date;

(c) Any covenant, representation or warranty contained in any Loan Documents with respect to such Account has been breached;

(d) The Account Debtor has disputed liability with respect to such Account, or the Account Debtor has made any claim with respect to any other Account due from such Account Debtor to Borrower, or the Account is or may become subject to any right of setoff by the Account Debtor;

(e) It arises from a sale to the Account Debtor on a bill and hold, guaranteed sale, sale or return, sale on approval, consignment or any other repurchase or return basis;

(f) The goods giving rise to such Account have not been delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been performed by Borrower and accepted by the Account Debtor or the Account otherwise does not represent a final sale with respect to such goods or services;

(g) The Account is evidenced by chattel paper or an instrument, or has been reduced to judgment;

(h) Borrower has made any agreement with the Account Debtor for any deduction therefrom, except for discounts and allowances which are made in the ordinary course of business for prompt payment and which discounts and allowances are reflected in the calculation of the face value of each invoice related to such Account; or

(i) Borrower has made any agreement with the Account Debtor to extend the time of payment thereof.

*"Funding Source"* shall mean, at any time of determination, the financial institution or other lender which has committed to provide moneys to Lender for the purposes of providing moneys to fund Advances made hereunder and other loans which Lender may have committed to make to other borrowers.

*"GAAP"* shall mean, as in effect from time to time, generally accepted accounting principles consistently applied.

*"Guaranty Agreement"* shall mean that certain Guaranty, dated as of the Agreement Date, from a Guarantor in favor of Lender, in form and substance approved by Lender.

*"Lien"* shall mean, with respect to any Property, any security deed, mortgage, deed to secure debt, deed of trust, lien, pledge, assignment, charge, security interest, title retention agreement, levy, execution, seizure, attachment, garnishment, or other encumbrance of any kind in respect of such property, whether or not choate, vested, or perfected.

*"Loan"* shall mean and include all loans and advances made by Lender to or for the benefit of Borrower hereunder or under any of the Loan Documents.

*"Loan Documents"* shall mean this Agreement, the Note, the Assignment, the Guaranty Agreement, the Uniform Commercial Code financing statements required by Applicable Law to perfect the Liens of Lender or the Collateral Trustee for the benefit of Lender, in the Collateral, and all other documents or other instruments or agreements now or hereafter executed in connection herewith.

*"Loan Period"* shall mean the period beginning on each Loan Period Commencement Date and ending on the day immediately preceding the next successive Loan Period Commencement Date.

*"Management Fee"* shall mean the amounts payable by Borrower to Lender under the terms of Section 2.4(a) hereof, and is comprised of the Initial Management Fee and all Additional Management Fees.

*"Materially Adverse Effect"* shall mean the effect of any event or condition which, alone or taken together with all other events or conditions occurring or existing contemporaneously therewith, (a) has or may reasonably be expected to have a material adverse effect upon the business, operations, Properties or condition (financial or otherwise) of Borrower; (b) has or may reasonably be expected to have any material adverse effect whatsoever upon the validity or enforceability of this Agreement or any of the other Loan Documents; (c) has or may reasonably be expected to have any material adverse effect upon the Collateral, the Liens of Lender or the Collateral Trustee for the benefit of Lender with respect to the Collateral, or the priority of such Liens; or (d) materially impairs the ability of Borrower or any Guarantor to perform its obligations under this Agreement or any other Loan Document to which they are respectively a party, or of Lender to enforce and collect

the Obligations of Lender, or the Collateral Trustee for the benefit of Lender, to realize upon any of the Collateral in accordance with the Loan Documents and Applicable Law.

"*Maximum Rate*" shall mean the maximum non-usurious rate of interest permitted by Applicable Law that at any time, or from time to time, may be contracted for, taken, reserved, charged or received on the Indebtedness in question, or, to the extent permitted by Applicable Law, under such Applicable Law that may hereafter be in effect and which allow a higher maximum non-usurious interest rate than Applicable Law now allows.

"*Necessary Authorizations*" shall mean all authorizations, consents, approvals, permits, licenses and exemptions of, filings and registrations with, and reports to, all governmental and other regulatory authorities, whether federal, state or local, and all agencies thereof.

"*Note*" shall mean the promissory note issued by Borrower in the face principal amount of the Commitment Amount, payable on demand to the order of Lender, which indicates by its terms that it is intended to be the "Note" referred to in this Agreement, together with all amendments and supplements thereto, and any other notes executed and delivered by Borrower to Lender hereunder.

"*Obligations*" shall mean all payment and performance duties, liabilities, and obligations of Borrower to Lender, whether now existing or hereafter created, incurred, or arising, and whether direct or indirect, absolute or contingent, primary or secondary, due or to become due, including without limitation, all liabilities now or at any time or times hereafter owing to Lender under this Agreement, the Note and the other Loan Documents.

"*Organizational Documents*" shall mean the charter and other organizational documents of Borrower providing for the incorporation, organization, formation and operation of Borrower, including, without limitation (and as applicable) its articles of incorporation, certificate of incorporation, bylaws, partnership agreement or partnership certificate, articles of organization or operating agreement.

"*Overadvance Condition*" shall mean, at any date, a condition such that the aggregate principal amount of the Loan outstanding to Borrower on such date exceeds the Borrowing Base on such date.

"*Person*" shall mean an individual, corporation, partnership, trust, limited liability company or unincorporated organization, or a government or any agency or political subdivision thereof.

"*Property*" shall mean any interest in any kind of property or asset, whether real or personal, tangible or intangible.

"*Receivables*" shall mean all Accounts arising under Designated Contracts and other Collateral of Borrower in which Lender, or the Collateral Trustee for the benefit of Lender, shall have been granted a Lien pursuant to the Loan Documents.

"*Request for Advance*" shall mean a certificate designated as a "Request for Advance" and signed by an Authorized Signatory requesting an Advance hereunder, which shall be in substantially the form of Exhibit B hereto attached and incorporated herein by this reference.

"*Servicer*" shall mean the servicing institution to whom responsibility for servicing the Loan hereunder has been delegated by Lender, which for all purposes of this Agreement until notification to the contrary is delivered to Borrower by Lender, shall be the Servicer designated on the cover page hereof.

"*Solvent*" shall mean, as to any Person, that such Person has capital sufficient to carry on its businesses and transactions in which it is about to engage and is able to pay its debts as they mature and owns property having a value, both at fair valuation and at present fair saleable value, greater than the amount required to pay its debts.

"*Supplemental Commitment Letter*" shall mean a supplemental commitment letter from Lender to Borrower and accepted by Borrower which provides for change of the Commitment Amount, extension of the Commitment Termination Date, funding with respect to one or more additional Designated Contracts, or other change to or amendment of the provisions of the financial accommodations provided by Lender to Borrower under the terms of this Agreement.

Each definition of a document in this Article 1 shall include such document as amended, modified, supplemented, extended or renewed from time to time in accordance with the terms thereof. Except where the context otherwise requires, definitions imparting the singular shall include the plural and vice versa. Except where specifically restricted, reference to a party to a Loan Document includes that party and its heirs, executors, administrators, personal representatives, successors and permitted assigns.

## ARTICLE 2. The Loan

2.1 The Loan. Lender agrees, upon the terms and subject to the conditions of this Agreement, to make Advances to Borrower on any Business Day prior to the Commitment Termination Date, upon receipt by Lender of a Request for Advance, in amounts which in the aggregate at any one time outstanding do not exceed the Commitment; provided, however, that Lender shall have no obligation whatsoever to make any Advances to Borrower if, at the time of Borrower's request therefor, the aggregate principal amount of the Loan then exceeds, or would exceed after funding of such Advance, the Borrowing Base. Advances made pursuant to this Section may be repaid and reborrowed in accordance with the terms hereof.

2.2 Manner of Borrowing. Borrower shall request each Advance of the Loan by delivering to Lender a written Request for Advance, accompanied by a current Borrowing Base Certificate, at least three (3) Business Days prior to the day on which the Advance is requested to be made. Notices received no later than 10:00 A.M. (Memphis, Tennessee time) on a Business Day will be deemed to have been received on the date of receipt. Notices received after 10:00 A.M. (Memphis, Tennessee time) on a Business day or at any time on a date which is not a Business Day shall be deemed to have been received on the next Business Day.

2.3 Interest.

(a) On Advances. Subject to the provisions of Section 2.3(b) below, Borrower shall pay interest on the unpaid principal amount of the Advances of the Loan outstanding from the Effective Advance Date with respect to each Advance through the Effective Credit Date for each repayment of principal on the Loan at the fixed per annum interest rate specified on the cover page hereof. Interest on each Advance for the initial Loan Period shall be due and payable in advance on the date such Advance is funded and deducted from the Advance with respect to which the interest is payable, and interest for each successive Loan Period or portion thereof that such Advance is outstanding shall be due and payable, in advance, on the first day of each successive Loan Period, whether or not such Advance remains outstanding for the entire Loan Period. No interest on the Loan which has become payable shall be refundable except to the extent and under the circumstance specified in subdivision (d) of this Section 2.3.

(b) Default Rate/Late Payment Fee. Overdue payments of principal and (to the extent permitted by Applicable Law) interest shall bear interest at the Default Rate and, if not paid within ten (10) days following the due date thereof, shall also be subject to a late payment charge, as and to the extent provided in the Note.

(c) Computation of Interest at a Variable Rate. If the interest rate specified on the cover page hereof is a variable rate of interest, interest will be calculated on a daily basis (computed on the actual number of days elapsed over a year of 360 days) on the principal balance of the Loan outstanding at any time or from time to time. The calculation of interest on the basis of a 360-day year, as opposed to a year of 365 days, results in a higher effective rate of interest hereunder. If the interest rate on the Loan changes during a Loan Period due to a change in the Prime Rate, resulting in an increase or decrease in the amount of interest payable with respect to such month, any such increase shall be payable on the first day of the next succeeding Loan Period and any decrease shall be credited to the interest payment due on the first day of the next succeeding Loan Period.

(d) Maximum Interest. Regardless of any provision contained in this Agreement, the Note or any of the other Loan Documents, in no contingency or event whatsoever shall the aggregate of all amounts that are contracted for, charged or collected pursuant to the terms of this Agreement, the Note or any of the other Loan Documents and that are deemed

interest under Applicable Law, exceed the highest rate permissible under any Applicable Law. No agreements, conditions, provisions or stipulations contained in this Agreement, the Note or any of the other Loan Documents, or Lender's right to demand payment at any time of all or any portion of the Obligations, or the exercise of any option whatsoever contained in any of the Loan Documents, or the prepayment by Borrower of any of the Obligations, or the occurrence of any contingency whatsoever, shall entitle Lender to charge or receive in any event, interest or any charges, amounts, premiums or fees deemed interest by Applicable Law (such interest, charges, amounts, premiums and fees referred to herein collectively as "Interest") in excess of the Maximum Rate, and in no event shall Borrower be obligated to pay Interest exceeding the Maximum Rate, and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay Interest exceeding the Maximum Rate shall be without binding force or effect, at law or in equity, to the extent only of the excess of Interest over the Maximum Rate. If any Interest is charged or received in excess of the Maximum Rate ("Excess"), Borrower acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and the Excess, to the extent received, shall be applied first to reduce the principal of the Obligations and the balance, if any, returned to Borrower, it being the intent of the parties hereto not to enter into a usurious or otherwise illegal relationship. For the purpose of determining whether or not any Excess has been contracted for, charged or received by Lender, all Interest at any time contracted for, charged or received from Borrower in connection with any of the Loan Documents shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated and spread in equal parts throughout the full term of the Obligations. The provisions of this Section shall be deemed to be incorporated into every Loan Document (whether or not any provision of this Section is referred to therein).

2.4 Fees.

(a) Management Fee. As consideration to Lender for processing the application of Borrower for the Loan to be made hereunder and in consideration of the agreement of Lender to manage and facilitate collection of the Accounts arising under Designated Contracts through the Commitment Termination Date, Borrower agrees to pay to Lender the Initial Management Fee. As consideration to Lender for processing the application of Borrower for any change in the Commitment (including an application of Borrower for a Loan or Loans with respect to one or more Designated Contracts in addition to the Designated Contract or Designated Contracts specified in the Commitment Letter) and managing and facilitating collection of Accounts arising under any such additional Designated Contracts and during the period of any extension of the Commitment specified in a Supplemental Commitment Letter Borrower agrees to pay to Lender such Additional Management Fees as may be specified from time to time in one or more Supplemental Commitment Letters executed by Lender and accepted by Borrower.

The Initial Management Fee is payable to Lender only with respect to the Designated Contract or Designated Contracts specified in the Assignment and only with respect to the

Commitment of Lender through the Commitment Termination Date, and is due and payable (subject to the provision for payment in installments hereinafter set forth) on the Agreement Date notwithstanding the fact that Lender has not received all documents required herein to obligate Lender to make the initial Advance hereunder, such fee being fully earned on the Agreement Date and non-refundable when paid. In the event that the Loan Documents are amended to provide for funding by Lender of any additional Designated Contracts or to extend the Commitment Termination Date or to increase the Commitment Amount, Borrower shall pay to Lender the Additional Management Fee (if any) set forth in the Supplemental Commitment Letter with respect thereto, which shall be due and payable (subject to the provision for payment in installments hereinafter set forth) on the date of the amendment of the Loan Documents made pursuant to the Supplemental Commitment Letter (the "Amendment Date") notwithstanding the fact that Lender has not received all documents required herein to obligate Lender to make the any additional Advances contemplated in such Supplemental Commitment Letter, such fee being fully earned on the Amendment Date and non-refundable when paid. The Initial Management Fee shall be paid in a number of equal installments equal to the lesser of (i) ten, or (ii) the number of whole calendar months from the date of the first Advance hereunder until the Commitment Termination Date in effect on the date of such Advance. The first such installment shall be payable on the date of such first Advance, and the remainder of such installments shall be payable on the first day of each month thereafter until such Management Fee shall have been paid in full.

Each Additional Management Fee shall be paid in a number of equal installments equal to the lesser of (i) ten, or (ii) the number of whole calendar months from the date of the first Advance hereunder made subsequent to the Amendment Date until the Commitment Termination Date in effect on the date of such Advance. The first such installment of an Additional Commitment Fee shall be payable on the date of such first Advance subsequent to the Amendment Date, and the remainder of such installments shall be payable on the first day of each month thereafter until such Management Fee shall have been paid in full.

Notwithstanding the foregoing provisions providing for payment of Management Fees in installments, if at any time the aggregate amount of Eligible Receivables pledged under the Loan Documents is less than the aggregate amount of all Obligations (including Management Fees) payable to Lender hereunder, the remaining balance of all such Management Fees shall be immediately due and payable to Lender.

(b) Processing and Administration Fee. Borrower shall pay to Lender the Processing and Administration Fee with respect to each Request for Advance submitted to Lender hereunder, payable at the time each such Advance is made. Such fee shall, at the option of Lender, be deducted from the Advance with respect to which such fee is payable.

(c) Reimbursement of Expenses. Borrower agrees to pay to Lender (i) the legal fees and expenses of legal counsel for Lender associated with preparation of the Commitment Letter and any Supplemental Commitment Letter, preparation of the Loan Documents and all amendments and supplements thereto, supervision of closing, preparation of all required legal

opinions and associated review and legal research, and (ii) the actual out-of-pocket expenses incurred by Lender in administering this Agreement, the Loan Documents and the financial transaction contemplated herein and therein, including communications costs, express document delivery services, filing fees, costs of credit reports and record searches, and the like; provided, that no charge shall be made by Lender to Borrower for salaries or compensation of Lender's regularly employed personnel or charges constituting an allocation of Lender's office overhead expenses. All such expenses incurred through closing of execution and delivery of this Agreement and the related transactions shall be charged to Borrower at the time of closing, and all such expenses not charged to Borrower at the time of closing (whether such charges had not been accrued or had not been billed to Lender in sufficient time to be charged to Borrower at the time of closing) will be charged to Borrower from time to time thereafter as incurred. Any such expenses not paid by Borrower prior thereto shall at the option of Lender be deducted from any Advance to be made to Borrower, any amounts collected by Lender or the Collateral Trustee from Accounts pledged hereunder (at the option of Lender either prior to or after application of such collections to other Obligations of Borrower), or from any other funds of Borrower held by or paid to Lender or the Collateral Trustee from time to time.

2.5 Repayment of the Loan.

(a) Borrower's obligation to pay the principal of and interest on the Loan shall be evidenced by the Note. The principal of the Loan, and all other Obligations of Borrower not otherwise paid or provided for to the satisfaction of Lender, including, without limitation, interest, fees and expenses, shall be paid by Borrower to Lender upon the earliest of: (i) the receipt by Borrower, Lender or the Collateral Trustee on behalf of Lender of any proceeds of any of the Collateral, to the extent of such proceeds, (ii) the date on which payment in full of the Obligations is demanded by Lender in a written notice to Borrower, or (iii) the Commitment Termination Date, with or without demand by Lender. Interest accrued on the principal amount of the Loan outstanding from time to time shall be calculated and paid as provided in Section 2.3 hereof.

(b) Notwithstanding anything to the contrary contained elsewhere in this Agreement, if an Overadvance Condition shall exist, Borrower shall, without the necessity of a demand, repay the outstanding Loan in an amount sufficient to reduce the aggregate unpaid principal amount of the Loan outstanding by an amount equal to such excess.

2.6 Manner of Payment.

(a) Each payment (including prepayments) by Borrower on account of the principal of or interest on the Loan, fees, interest, expenses and any other amount owed to Lender under this Agreement, the Note or any other Loan Document shall be made not later than 11:00 A.M. (Memphis, Tennessee time) on the date specified for payment under this Agreement or other Loan Document to Lender in lawful money of the United States of

America in immediately available funds. Amounts received after such time shall be deemed to have been received on the next Business Day.

(b) If any payment under this Agreement or the Note shall be specified to be made upon a day which is not a Business Day, it shall be made on the next succeeding day which is a Business Day, and such extension of time shall in such case be included in computing interest and fees, if any, in connection with such payment.

(c) Borrower agrees to pay principal, interest, fees, expenses and all other amounts due hereunder or under the Note without set-off or counterclaim or any deduction whatsoever.

(d) If some but less than all amounts due from Borrower are received by Lender, Lender shall apply such amounts in the following order of priority: (i) to the payment of any fees and expenses then due and payable, in such order or priority as Lender may determine in its sole discretion; (ii) to the payment of all other amounts not otherwise referred to in this Section 2.6(d) then due and payable hereunder or under the Loan Documents; (iii) to the payment of interest then due and payable on the Loan; and (iv) to the payment of principal then due and payable on the Loan.

2.7 Statement of Account. Lender will account to Borrower monthly with a statement of the Loan, charges and payments made pursuant to this Agreement, and such accounting rendered by Lender shall be final, binding and conclusive upon Borrower unless Lender is notified by Borrower in writing to the contrary within thirty (30) days after the date on which such accounting is deemed to have been sent pursuant to Section 7.1 hereof. Such notice shall only be deemed an objection to those items specifically objected to therein.

2.8 Term of Commitment. Subject to Lender's right to demand payment in full of the Obligations at any time and thereupon terminate the Commitment, the Commitment shall remain in full force and effect until the Commitment Termination Date; provided, that Borrower may request the earlier termination of the Commitment at any time upon written notice to Lender and by paying to Lender all outstanding principal, accrued interest, fees, expenses and other charges owing under the terms of this Agreement and the other Loan Documents. On the Commitment Termination Date, the Commitment shall expire and Lender shall have no further obligation to make Advances to Borrower hereunder. Notwithstanding such termination, the Liens of Lender and of the Collateral Trustee for the benefit of Lender in all of the Collateral shall remain in full force and effect until all of the Obligations owing to Lender have been paid and satisfied in full.

## ARTICLE 3. Conditions Precedent to Each Advance.

The obligation of Lender to make each Advance, including but not limited to the initial Advance, is subject to the fulfillment of each of the following conditions immediately prior to or contemporaneously with such Advance:

3.1 Conditions Precedent to Initial Advance. Borrower shall have satisfied all of the conditions precedent to the making of the initial Advance specified in the Commitment Letter.

3.2 Conditions Precedent to All Advances. Notwithstanding any of the provisions of this Agreement or the other Loan Documents, and without affecting in any manner the rights of Lender under the other sections of this Agreement, it is understood and agreed that Lender will have no obligation to make any Advance (including the initial Advance) unless and until, in addition to the conditions set forth in Section 3.1 hereof, each of the following conditions is satisfied.

(a) No Violation. No violation of any Obligation of Borrower hereunder or under any of the other Loan Documents to which it is a party, and no violation of any obligation of the Guarantor under the Guaranty Agreement, shall have occurred and be continuing.

(b) No Overadvance Condition. No Overadvance Condition shall have occurred and be continuing, and funding of such Advance will not cause an Overadvance Condition to exist.

(c) Delivery of Documents. Lender shall have received a Request for Advance duly executed by an Authorized Signatory and copies of all other documents, reports and information required to be delivered to Lender under this Agreement or any of the other Loan Documents.

(d) Representations and Warranties of Borrower. The representations and warranties contained in Article 4 of this Agreement and in the other Loan Documents shall be true and correct in all material respects, except for changes in the nature of Borrower's business or operations that would render the information contained herein or in any schedule attached hereto either inaccurate, incomplete or misleading, so long as Lender has consented to such changes or such changes are expressly permitted by this Agreement.

(e) Performance of Loan Documents. All covenants and agreements on the part of Borrower to be performed under this Agreement and the other Loan Documents shall have been performed and all conditions precedent referred to in Section 3.1 hereof shall have been fulfilled.

(f) Assignment of Receivables under Designated Contracts. As to any Advance to be funded with respect to a Receivable arising from an invoice or other request for payment (an "Invoice") issued by Borrower under a Designated Contract:

(i) Borrower shall have delivered to Lender a true and correct copy of Borrower's Invoice(s) together with a copy of a Notice of Assignment of such Invoice and all amounts payable thereunder to the Collateral Trustee and evidence satisfactory to Lender that such Notice of Assignment has been delivered to the Account Debtor and to all sureties, if any, on the Designated Contract;

(ii) The Designated Contract shall include or have incorporated by reference the "no setoff" commitment contained in Alternative I of the clause set forth at Sec. 52.232-23 of the Federal Acquisition Regulations and referred to at 48 C.F.R. §32.806;

(iii) Borrower will certify that the proceeds of such Advance will be applied to payment of costs associated with performance of the Designated Contract;

(iv) All steps necessary to perfect the Collateral Trustee's security interest in the proceeds of the Designated Contract shall have been completed to Lender's satisfaction, including, without limitation, obtaining the agreement of any creditors of Borrower with conflicting security interests to subordinate such conflicting security interest to the security interest of the Collateral Trustee therein;

(v) The Account Debtor shall have been properly notified of the Assignment in accordance with the Assignment of Claims Act and, with respect to each Invoice to be funded pursuant to this Agreement, the goods or services (or both, as applicable) and other amounts covered by each such Invoice shall have been fully and unconditionally accepted by the Account Debtor, as evidenced by a written certification of an authorized representative of the Account Debtor; and

(vi) Borrower shall be in full compliance with the Loan Documents and all other assignment and funding agreements in effect between Borrower and Lender with respect to other government contracts.

(g) Approval of Advance by Funding Source. The undertaking of Lender to make loans to Borrower hereunder shall in all instances be conditioned upon the approval of each Advance by Lender's Funding Source and the availability to Lender of funds from its Funding Source for the purpose of funding each Advance.

3.3 Waiver of Conditions Precedent. If Lender makes any Advance prior to the fulfillment of any of the conditions precedent set forth in Sections 3.1 and 3.2 hereof, the making of such Advance shall constitute only an extension of time for the fulfillment of such condition and not a waiver thereof, and Borrower shall thereafter use its best efforts to fulfill such condition promptly, but in any event within such extended time frame as Lender shall require.

ARTICLE 4. Representations and Warranties.

4.1 Representations and Warranties. Borrower hereby represents and warrants that:

(a) Organization; Power; Qualification. Borrower is an entity of the type specified on the cover page hereof duly organized or formed, validly existing, and in good standing under the laws of the State or other jurisdiction specified on the cover page hereof opposite the heading "Borrower Jurisdiction," has the power and authority, corporate, partnership and otherwise, to own or lease and operate its Properties and to carry on its business as now being and hereafter proposed to be conducted, and is duly qualified and is in good standing as a foreign entity and authorized to do business in each jurisdiction in which the character of its Properties or the nature of its business requires such qualification or authorization and in which failure to so qualify would have a Materially Adverse Effect.

(b) Authorization; Enforceability. Borrower has the power, corporate, partnership and otherwise, and has taken all necessary action, to authorize it to execute, deliver, and perform this Agreement and each of the other Loan Documents to which it is a party in accordance with the terms thereof and to consummate the transactions contemplated hereby and thereby. This Agreement and each other Loan Document to which it is a party have been duly executed and delivered by Borrower, and are legal, valid, and binding obligations of Borrower, enforceable in accordance with their respective terms.

(c) Compliance with Laws, Organizational Documents and Other Documents; Governmental Consents; Creation of Other Liens. The execution, delivery, and performance of this Agreement and each of the other Loan Documents in accordance with their terms and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any Applicable Law, (ii) conflict with, result in a breach of, or constitute a default under the Organizational Documents of Borrower or any indenture, agreement, or other instrument to which Borrower is a party or by which it or any of its Properties may be bound, (iii) require any consent, approval, order, authorization or designation of, or any registration, declaration or filing with, any federal, state or local governmental authority or public body on the part of Borrower (except for the filing of Uniform Commercial Code financing statements and for any actions required to be taken by the appropriate federal governmental authorities pursuant to the Assignment of Claims Act in order to effectuate the assignment of Eligible Receivables to Lender or the Collateral Trustee for the benefit of

(j) Broker's or Finder's Commissions. No broker's or finder's fee or commission is or will be payable by Borrower with respect to the issuance of the Note, and no other similar fees or commissions are or will be payable by Borrower for any other services rendered to Borrower ancillary to the transactions contemplated herein, except as set forth in Schedule 1 hereto.

(k) Name of Borrower. Borrower has not been known as or used any fictitious or trade name other than its own name, or previously had any name other than the name of Borrower specified on the cover page hereof, except as set forth in Schedule 1 hereto.

(l) Chief Executive Office. Borrower's chief executive office is located at the Borrower's Address set forth on the cover page hereof.

4.2 Survival of Representations and Warranties, etc. All representations and warranties made under this Agreement shall be deemed to be made, and shall be true and correct, at and as of the Agreement Date and at and as of the date of each Advance, except to the extent previously fulfilled in accordance with the terms hereof and to the extent subsequently inapplicable, and except to the extent (if any) as may be specifically set forth in a written statement of Borrower filed with Lender at or prior to the time any Request for Advance is delivered to Lender. Borrower acknowledges that funding of any Advance hereunder is conditioned, among other things, on approval of any exceptions so disclosed by Borrower to Lender. All representations and warranties made under this Agreement shall survive, and not be waived by, the execution hereof by Lender, any investigation or inquiry by Lender, or the making of any Advance under this Agreement.

## ARTICLE 5. General Covenants.

So long as any of the Obligations is outstanding and unpaid or Borrower shall have the right to borrow hereunder (whether or not the conditions precedent to borrowing have been or can be fulfilled), and unless Lender shall otherwise consent in writing:

5.1 Preservation of Existence and Similar Matters. Borrower shall (a) preserve and maintain its existence, rights, franchises, licenses, and privileges in its jurisdiction of incorporation or formation, including, without limitation, all Necessary Authorizations, and (b) qualify and remain qualified and authorized to do business in each jurisdiction in which the character of its Properties or the nature of its businesses requires such qualification or authorization.

5.2 Compliance with Applicable Law. Borrower shall comply with all requirements of Applicable Law, non-compliance with which could have a Materially Adverse Effect.

5.3 Accounting Methods and Financial Records. Borrower shall maintain a system of accounting, established and administered in accordance with GAAP, and shall keep adequate records and books of account in which complete entries shall be made in accordance with such accounting principles, consistently applied and reflecting all transactions required to be reflected by such accounting principles.

5.4 Payment of Taxes and Claims. Borrower shall pay and discharge all taxes, assessments, and governmental charges or levies imposed upon it or upon its income or profits or upon any Properties belonging to it prior to the date on which penalties attach thereto, and all lawful claims for labor, materials, and supplies which, if unpaid, might become a Lien or charge upon any of its Properties.

5.5 Visits and Inspections. Borrower shall permit representatives of Lender, the Collateral Trustee, the Servicer, or any Funding Source identified by written notice to Borrower executed by Lender or the Servicer to (a) visit and inspect the properties of Borrower during normal business hours, (b) inspect and make extracts from and copies of its books and records, and (c) discuss with its principal officers its businesses, assets, liabilities, financial positions, results of operations and business prospects relating to Borrower.

5.6 Use of Proceeds. Borrower shall use the proceeds of all Advances made with respect to any Designated Contract to fund costs of Borrower associated with performance of the Designated Contract with respect to which such Advance is made.

5.7 Further Assurances. Borrower shall promptly cure, or cause to be cured, defects in the creation and issuance of the Note, the execution and delivery of the other Loan Documents (including this Agreement), and the perfection of any Liens in favor of Lender or the Collateral Trustee for the benefit of Lender. Borrower, at its expense, shall promptly execute and deliver to Lender or the Collateral Trustee for the benefit of Lender, or cause to be executed and delivered to Lender or the Collateral Trustee, all such other and further documents, agreements and instruments in compliance with or accomplishment of the covenants and agreements of Borrower in the Loan Documents, or to evidence further and more fully describe the Collateral or to correct any omissions in the other Loan Documents, or more fully to state the obligations set out herein or in any of the Loan Documents, or to perfect, protect or preserve the assignment of the Collateral to or for the benefit of Lender and any Liens created pursuant to any of the Loan Documents, or to make any recordings, to file any notices or to obtain any consents, all as may be necessary or appropriate in connection therewith as may be reasonably requested by Lender.

5.8 Broker's Claims. Borrower hereby indemnifies and agrees to hold Lender harmless from and against any and all losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees and expenses) which may be suffered or incurred by Lender in respect of any claim, suit, action or cause of action now or hereafter asserted by a broker or any Person acting in a similar capacity arising from or in connection with the execution and delivery of this Agreement or any other Loan Document or the consummation

of the transactions contemplated herein or therein, other than claims with respect to fees or commissions claimed to be due by a broker or any Person acting in a similar capacity under a written agreement specifically obligating Lender to pay a brokerage fee, finder's fee or similar fee or commission executed by Lender.

5.9 Location of Collateral. All of the Collateral and all records of Borrower pertaining to the Collateral shall at all times be kept by Borrower at its chief executive office referred to in Section 4.1(l) hereof and the other locations, if any, as are specified in Schedule 1 hereto. Without the prior written consent of Lender, the Collateral shall not be moved therefrom, except upon (a) at least thirty (30) days prior written notice to Lender and (b) execution and delivery by Borrower, at its expense, of such documents, instruments, agreements and certificates (including, without limitation, additional financing statements) as Lender in its sole discretion shall determine are necessary or advisable to perfect or preserve the perfection of any Lien on the Collateral created under the Loan Documents and to otherwise protect the interests of Lender or the Collateral Trustee for the benefit of Lender in connection with the transactions contemplated by this Agreement.

5.10 Protection of Collateral. All expense of protecting, storing, handling, maintaining and shipping the Collateral, and all excise, property, sales and use taxes imposed by any Federal, state or local authority on any of the Collateral, shall be borne and paid by Borrower. If Borrower fails to pay promptly any portion thereof when due, Lender may, at its option, but shall not be required to, pay the same and charge Borrower therefor. Lender shall not be liable or responsible to Borrower in any way for the safekeeping of any of the Collateral or for any loss or damage thereto or for any diminution in the value thereof, or for any act or default of the Collateral Trustee or any other Person whomsoever, but the same shall be at Borrower's sole risk.

5.11 Lockbox Account. Borrower shall cause payments on all Receivables to be made to the Collateral Trustee or to a lockbox designated by the Collateral Trustee for deposit by the Collateral Trustee. All remittances received by Borrower on account of the Receivables, together with the proceeds of any other Collateral, shall be held as Lender's property by Borrower as trustee of an express trust for the benefit of Lender, and Borrower shall immediately notify Lender, the Servicer and the Collateral Trustee of the receipt thereof by Borrower and remit the same to the Collateral Trustee for such purpose.

5.12 Bank Charges. Borrower shall pay to Lender, ON DEMAND, all fees, costs and expenses which Lender or the Collateral Trustee pays to a bank or other similar institution arising out of or in connection with (a) the forwarding to Borrower or any other Person on behalf of Borrower by Lender or the Collateral Trustee of proceeds of the Advances made by Lender to Borrower pursuant to this Agreement and (b) the depositing for collection by Lender or the Collateral Trustee of any check or item of payment received or delivered to Lender or to the Collateral Trustee for application to the Obligations.

ARTICLE 6. Information Covenants.

So long as any of the Obligations is outstanding and unpaid or Borrower has a right to borrow hereunder (whether or not the conditions precedent to borrowing have been or can be fulfilled) and unless Lender shall otherwise consent in writing, Borrower will furnish or cause to be furnished to Lender as provided in Section 7.1 hereof:

6.1 Annual Financial Statements and Information: Accountants Report; Certificate of No Default. Within ninety (90) days after the end of each fiscal year of Borrower, the balance sheets of Borrower as at the end of such fiscal year and the related statements of income, retained earnings, and changes in cash flow of Borrower for such fiscal year, setting forth in comparative form the figures as at the end of and for the previous fiscal year and accompanied by a compilation letter of the independent certified public accountants whose compilation report or compilation letter accompanied the most recent financial statements of Borrower delivered to Lender prior to the date of this Agreement or other independent certified public accountants reasonably satisfactory to Lender, whose compilation report or compilation letter shall be in scope and substance satisfactory to Lender, and who shall have authorized Borrower to deliver such compilation report or compilation letter and accompanying financial statements to Lender pursuant to this Agreement. The annual financial statements of Borrower shall be accompanied by a certificate of the chief executive officer or chief financial officer of Borrower to the effect that the officer of Borrower executing such certificate has conferred with the accountants which prepared the accountants' report accompanying the financial statements of Borrower concerning the subject matter of such certificate, and either (a) that Borrower is in compliance with all covenants and requirements of this Agreement and the Assignment and no Overadvance Condition existed as of the last day of the fiscal year of Borrower to which such financial statements pertain, or (b) describing in detail any such breach, noncompliance or Overadvance Condition which then existed and indicating whether such condition continues to exist as of the date of such certificate and the steps being taken by Borrower to remedy such noncompliance or eliminate such Overadvance Condition.

6.2 Monthly Financial Statements and Information. Within thirty (30) days after the last day of each month, the unaudited operating statements of Borrower as of the end of such month showing in reasonable detail the revenues, expenses and profit (or loss) of Borrower for such month and for the elapsed portion of the year ended with the last day of such month, which shall either be prepared in accordance with GAAP or be prepared on a cash accounting basis and be accompanied by a report of all accounts payable and other liabilities of Borrower as of the end of such month, all certified by the chief financial officer of Borrower to be, in his opinion, complete and correct in all material respects and to present fairly the financial position of Borrower as at the end of such period and the results of operations for such period, and for the elapsed portion of the year ended with the last day of such period, subject only to normal year-end adjustments.

6.3 Copies of Other Reports. From time to time and promptly upon each request, such data, certificates, reports, statements, opinions of counsel, documents, or further information regarding the Collateral or the business, assets, liabilities, financial position, projections, results of operations, or business prospects of Borrower as Lender may reasonably request.

6.4 Notice of Litigation and Other Matters. Prompt notice of the following events after Borrower has, or in the exercise of reasonable diligence should have, received notice thereof:

(a) The commencement of any proceeding or investigation by or before any governmental body or any action or proceeding in any court or before any arbitrator (i) against, or (ii) (to the extent known to Borrower) in any other way relating adversely to, Borrower or any of its assets or businesses which, if adversely determined, could singly or when aggregated with all other such proceedings, investigations, and actions, if adversely determined, have a Materially Adverse Effect;

(b) Any material adverse change with respect to the business, assets, liabilities, financial position, results of operations, or business prospects of Borrower, other than changes in the ordinary course of business the effects of which have not had, and are not likely to have, a Materially Adverse Effect; and

(c) Any violation of this Agreement or any of the other Loan Documents to which Borrower is a party, or the occurrence or non-occurrence of any event or condition which constitutes, or which with the passage of time or giving of notice (or both) would constitute, a default by Borrower under any material agreement other than this Agreement or the other Loan Documents to which Borrower is a party or by which its properties may be bound;

in each case giving the details thereof and specifying the action proposed to be taken with respect thereto.

6.5 Borrowing Base Certificate. Borrower shall keep accurate and complete records with regard to the Eligible Receivables and the Loan and shall submit a Borrowing Base Certificate to Lender with each Request for Advance submitted by Borrower to Lender hereunder, and on such other periodic basis as Lender shall request.

## ARTICLE 7. Miscellaneous.

7.1 Notices.

(a) All notices and other communications required or permitted under this Agreement shall be in writing and, if mailed by prepaid first-class mail or certified mail, return receipt requested, at any time other than during a general discontinuance of postal

service due to strike, lockout or otherwise, shall be deemed to have been received on the earlier of the date shown on the receipt or three (3) Business Days after the postmarked date thereof and, if telecopied, shall be followed forthwith by letter and shall be deemed to have been received on the next Business Day following dispatch and acknowledgment of receipt by the recipient's telecopy machine. In addition, notices hereunder may be delivered by hand or overnight courier, in which event the notice shall be deemed effective when delivered. All notices and other communications to any party under this Agreement shall be given to the parties hereto at the following addresses:

| | |
|---|---|
| If to Borrower: | To Borrower's Address set forth on the cover page hereof |
| If to Lender: | Classical Receivables Funding Company, L.L.C.<br>4646 Poplar Avenue, Suite 213<br>Memphis, Tennessee 38117<br>Attn: Operating Manager<br>Facsimile No.: 901-682-6022<br><br>with a copy to the Servicer at the Servicer's Address set forth on the cover page hereof |
| If to the Collateral Trustee: | Reliance Trust Company<br>950 East Paces Ferry Road, Suite 2840<br>Atlanta, Georgia 30326<br>Attn: Susan L. Adams,<br>Senior Vice President<br>Facsimile No.: 404-365-7946 |

(b) Any party hereto may change the address to which notices shall be directed under this Section 7.1 by giving ten (10) days' written notice of such change to the other parties.

(c) Personal delivery to a party or to any officer, partner, agent, or employee of such party at its address herein shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received also shall constitute receipt.

7.2 Expenses. Borrower shall promptly pay:

(a) Upon closing of this Agreement, all out-of-pocket expenses of Lender (including, without limitation, attorneys' fees and expenses) in connection with the preparation, negotiation, execution, and delivery of the Commitment Letter, this Agreement, the Note and the other Loan Documents, including all post-closing matters, and the

transactions contemplated hereunder and thereunder and the making of the initial Advance hereunder, whether or not the initial Advance is made; and

(b) All costs and reasonable out-of-pocket expenses in connection with the administration of the Loan Documents, including the restructuring, refinancing and "work-out" of the transaction herein contemplated, the delivery of any amendment or waiver, or obtaining performance under this Agreement or the other Loan Documents, and all costs and out-of-pocket expenses of collection or enforcement, which in each case shall include fees and expenses of counsel for Lender.

7.3 Waivers. The rights and remedies of Lender under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any rights or remedies which it would otherwise have. No failure or delay by Lender in exercising any right shall operate as a waiver of it. Lender expressly reserves the right to require strict compliance with the terms of this Agreement in connection with any funding of a request for an Advance. In the event Lender decides to fund a request for an Advance at a time when Borrower is not in strict compliance with the terms of this Agreement, such decision by Lender shall not be deemed to constitute an undertaking by Lender to fund any further requests for Advances or preclude Lender from exercising any rights available to Lender under the Loan Documents or at law or equity. Any waiver or indulgence granted by Lender shall not constitute a modification of this Agreement, except to the extent expressly provided in such waiver or indulgence, or constitute a course of dealing by Lender at variance with the terms of this Agreement such as to require further notice by Lender of Lender's intent to require strict adherence to the terms of this Agreement in the future. In order to be effective as a waiver or indulgence under this Agreement, any such waiver or indulgence must be in writing, signed on behalf of Lender, approved by the Servicer and filed with the Collateral Trustee.

7.4 Assignment. Borrower may not assign or transfer any of its rights or obligations hereunder or under the Note without the prior written consent of Lender. Lender may at any time sell, assign, transfer, or otherwise dispose of, all or any portion of the Obligations of Borrower outstanding pursuant to this Agreement, the Note and the other Loan Documents. Borrower hereby agrees that any assignee or transferee of all or any portion of any amount owed by Borrower under this Agreement and the Note shall be entitled to the benefits of the provisions of this Agreement and the other Loan Documents as Lender hereunder. Borrower agrees that it shall use its best efforts to assist and cooperate with Lender in any manner reasonably requested by Lender to effect the sale of participations in or assignments of any of the Loan Documents or any portion thereof or interest therein, including without limitation assignment to the Collateral Trustee as contemplated in the Collateral Trust Agreement, and agrees that Lender may disclose credit information regarding Borrower to any potential Funding Source, participant or assignee. Except as specifically set forth in this Section, nothing in this Agreement or the Note, expressed or implied, is intended to or shall confer on any Person other than the respective parties hereto and thereto and their successors and assignees permitted hereunder and thereunder any

benefit or any legal or equitable right, remedy, or other claim under this Agreement or the Note.

7.5 Assignment of Loan Documents to Collateral Trustee. Borrower acknowledges that Lender anticipates that it will secure funds for the purpose of making Advances hereunder through funding arrangements with one or more Funding Sources from time to time, and that Lender will assign its right, title and interest in, to and under the Loan Documents to the Collateral Trustee as security for Lender's obligations in connection with such funding arrangement. Borrower hereby (i) agrees that the Collateral Trustee for all purposes of the Loan Documents constitutes a financing institution participating in the financing of Receivables under a Designated Contract for the benefit of Borrower, (ii) agrees that, as provided in the Assignment and Section 3.2(f) hereof, it will execute and deliver to the Collateral Trustee a separate assignment of each Designated Contract and each Account resulting from an Invoice pertaining to each Designated Contract as a condition to any Advance hereunder, and (iii) consents to each such pledge and assignment by Lender to the Collateral Trustee.

7.6 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.

7.7 Acceptance of Loan Documents by Lender. This Agreement, the Note and all other Loan Documents, following execution thereof by Borrower, shall be submitted to and shall be subject to approval by Lender at its loan processing office located at 12065 King Road, Roswell, Georgia 30075. Such approval by Lender shall be evidenced either by execution of this Agreement on behalf of Lender or by Advance of funds by Lender. This Agreement and the Commitment of Lender hereunder shall in no event be binding on Lender until so submitted and approved.

7.8 Governing Law. This Agreement and the Note shall be construed in accordance with and governed by the laws of the State of Georgia, without regard to its conflict of laws principles.

7.9 Severability. Any provision of this Agreement which is prohibited or unenforceable under Applicable Law shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.

7.10 Interest and Charges. Borrower and Lender hereby agree that (a) the only charge imposed by Lender upon Borrower for the use of money in connection with the Loan is and shall be the interest expressed herein, as provided in Section 2.3 hereof and in the Note, and (b) all other charges imposed by Lender upon Borrower in connection with the Loan, including, without limitation, any commitment fees, management fees, administrative and processing fees, late payment charges and charges for taxes and reserve requirements,

are and shall be deemed to be charges made to compensate Lender for administrative services and costs, and other services and costs performed and incurred, and to be performed and incurred, by Lender in connection with the Loan, and shall under no circumstances be deemed to be charges for the use of money. All charges referred to in herein shall be fully earned when due and non-refundable when paid.

7.11 Headings. Headings used in this Agreement are for convenience only and shall not be used in connection with the interpretation of any provision hereof.

7.12 Pronouns. The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

7.13 Entire Agreement; Amendments. This Agreement and the other Loan Documents represent the entire agreement between Borrower and Lender with respect to the subject matter of this transaction. No amendment or modification of the terms and provisions of this Agreement shall be effective unless in writing and signed by Borrower and Lender, approved by the Servicer and filed with the Collateral Trustee.

7.14 Interpretation. No provision of this Agreement or any of the other Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

7.15 Jurisdiction and Venue. AS PART OF THE CONSIDERATION FOR NEW VALUE RECEIVED, AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PLACE OF BUSINESS OF BORROWER OR LENDER, BORROWER HEREBY CONSENTS AND AGREES THAT THE STATE COURTS OF GEORGIA SITTING IN FULTON COUNTY, GEORGIA, OR, AT LENDER'S OPTION, THE UNITED STATES DISTRICT COURT SITTING IN SAID COUNTY, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO PERSONAL JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT WITH RESPECT TO ANY SUCH MATTERS, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS WITH RESPECT TO ANY SUCH ACTIONS OR PROCEEDINGS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE

MADE IN ACCORDANCE WITH THE PROVISIONS OF SECTION 7.1 OF THIS AGREEMENT. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHT OF LENDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

7.16 Additional Provisions and Terms. The additional provisions and terms set forth in Schedule 2 hereto shall apply in all instances to this Agreement and the interpretation of the provisions hereof and are hereby incorporated herein by reference and shall for all purposes constitute a part of this Agreement. In the event of inconsistency between the additional provisions and terms (if any) set forth on Schedule 2 hereto and the provisions of this Agreement contained in Article 1 through Article 7 hereof, the provisions and terms set forth on said Schedule 2 shall govern the application and interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement or caused it to be executed under seal by their duly authorized officers, all as of the day and year first above.

BORROWER:

AMERICAN RENOVATION & CONSTRUCTION COMPANY

By: [signature]
Anthony P. Dethloff
Vice President/Advancement

[SEAL]

LENDER:

CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C.

By: [signature] [SEAL]

Title: manager

ate: August 22, 1996

73826.W51
911.0000

# SCHEDULE 2
to
Loan Agreement

Additional provisions and terms applicable to this Loan Agreement are as follows:

1. The first paragraph on page 3 of the Loan Agreement is amended by adding at the end of said paragraph the following additional language:

"The cover sheet is an integral part of this Loan Agreement."

2. Article 1 of the Loan Agreement is hereby amended to add thereto an additional defined term as follows:

"*Bankruptcy Event*" shall be deemed to have occurred on (i) the date which is thirty (30) days following entry of a decree or order by a court having jurisdiction in the premises constituting an order for relief in respect of Borrower under Title 11 of the United States Code, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy law or other similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator, or similar official of Borrower or of any substantial part of its properties or of any of the Collateral, or ordering the winding-up or liquidation of the affairs of Borrower, unless such decree or order shall have been withdrawn or rescinded prior to the expiration of such 30-day period, or (ii) the date on which Borrower shall file a petition, answer, or consent seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy law or other similar law, or Borrower shall consent to the institution of proceedings thereunder or to the filing of any such petition or to the appointment or taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar official of Borrower or of any substantial part of its properties or of any of the Collateral, or Borrower shall fail generally to pay its debts as such debts become due, or Borrower shall take any corporate action in furtherance of any such action.

3. The definition of "*Eligible Receivable*" set forth in Article 1 of the Loan Agreement is amended by adding at the end of the first sentence thereof the following additional language:

"Evidence of approval for payment and of the authority of the person executing such approval which is transmitted to the Collateral Trustee or to Lender by facsimile shall be sufficient for purposes hereof."

4. Article 1 of the Loan Agreement is hereby further amended to add thereto an additional defined term as follows:

"*Maturity Date*" shall mean the date of maturity of the Note, as specified in the Note, which until such time as it may hereafter be amended, shall be the date which is two calendar months following the Commitment Termination Date.

5. The definition of the term "*Note*" appearing in Article 1 of the Loan Agreement is amended by deleting therefrom the words "on demand."

6 Article 1 of the Loan Agreement is hereby further amended to add thereto an additional defined term as follows:

"*Permitted Overadvance Condition*" shall mean an Overadvance Condition which is permitted under the provisions of Section 3.4 hereof.

7. The Loan Agreement is hereby further amended by deleting Section 2.1 thereof in its entirety and inserting in lieu thereof a new Section 2.1 to read in its entirety as follows:

2.1 The Loan. Lender agrees, upon the terms and subject to the conditions of this Agreement, to make Advances to Borrower on any Business Day prior to the earlier of (i) the date on which demand for payment of the outstanding principal amount of the Loan is made, and (ii) the Commitment Termination Date, upon receipt by Lender of a Request for Advance, in amounts which in the aggregate at any one time outstanding do not exceed the Commitment; provided, however, that Lender shall have no obligation whatsoever to make any Advances to Borrower if, at the time of Borrower's request therefor, the aggregate principal amount of the Loan then exceeds, or would exceed after funding of such Advance, the Borrowing Base. Advances made pursuant to this Section may be repaid and reborrowed in accordance with the terms hereof.

8. Section 2.2 of the Loan Agreement is hereby amended to substitute the words "two (2) Business Days" for the words "three (3) Business Days" appearing in said Section 2.2, and by substituting the term "12:00 Noon" for the term "10:00 A.M." in each instance where it appears in said Section 2.2.

9. Section 2.5 of the Loan Agreement is hereby amended to read in its entirety as follows:

2.5 Repayment of the Loan.

(a) Borrower's obligation to pay the principal of and interest on the Loan shall be evidenced by the Note. The principal of the Loan, and all other Obligations of Borrower not otherwise paid or provided for to the satisfaction of Lender, including, without limitation, interest, fees and expenses, shall be paid by Borrower to Lender (with or without demand by Lender except as otherwise specifically provided herein or in the Note) upon the earliest of: (i) the receipt by Borrower, Lender or the Collateral Trustee on behalf of Lender of any proceeds of any of the Collateral, to the extent of such proceeds, (ii) sixty (60)

days following the date on which payment in full of the Obligations is demanded by Lender in a written notice to Borrower, (iii) the Maturity Date, and (iv) the occurrence of a Bankruptcy Event. Interest accrued on the principal amount of the Loan outstanding from time to time shall be calculated and paid as provided in Section 2.3 hereof.

(b) Notwithstanding anything to the contrary contained elsewhere in this Agreement, if an Overadvance Condition (other than a Permitted Overadvance Condition) shall exist, Borrower shall, without the necessity of a demand, repay the outstanding Loan in an amount sufficient to reduce the aggregate unpaid principal amount of the Loan outstanding by an amount equal to such excess.

10. Subdivision (b) of Section 3.2 of the Loan Agreement is hereby further amended to read in its entirety as follows:

(b) <u>No Overadvance Condition; Permitted Overadvance Condition</u>. No Overadvance Condition (other than a Permitted Overadvance Condition) shall have occurred and be continuing, and funding of such Advance will not cause an Overadvance Condition (other than a Permitted Overadvance Condition) to exist.

11. The Loan Agreement is hereby further amended by adding a new Section 3.4 thereof to read in its entirety as follows:

3.4 <u>Advances Against Allowed Pending Claims</u>. In addition to the provisions of the Loan Agreement authorizing Loans to be made hereunder in the aggregate amount outstanding at any time not exceeding the Borrowing Base, additional Advances may be made to the Borrower and permitted to remain outstanding during the period commencing on the date of the initial Advance hereunder (the "Initial Advance Date") and ending 210 days following the Initial Advance Date, in an amount equal to the lesser of (x) $600,000 and (y) 20% multiplied by the amount of Allowed Pending Claims. The term "Allowed Pending Claims" means claims for additional compensation for work completed under a Designated Contract which had been filed by Borrower with the government contracting officer responsible for the corresponding Designated Contract on or prior to the Initial Advance Date and which claim is pending approval on the Initial Advance Date, provided the following additional requirements set forth in this Section 3.4 exist. No claim will constitute an Allowed Pending Claim unless (i) all rights of Borrower to payment thereof have been assigned to the Collateral Trustee or other designee of Lender, in a manner satisfactory to Lender, so as to comply with the Assignment of Claims Act, and Lender shall have been furnished with such evidence as it deems appropriate of such assignment and of the validity of the claim; (ii) the claim shall have been certified by Borrower to accurately reflect the amount of additional compensation due to Borrower under the corresponding Designated Contract and to be then currently pending and not to have been rejected or disallowed (without regard to

whether such rejection or disallowance is being contested or appealed) on the Initial Advance Date; (iii) the Collateral Trustee has a first priority Lien in all amounts payable to Borrower by reason of such claim pursuant to the Loan Documents; and (iv) the interests and rights of all sureties with respect to the Designated Contract to which such claim pertains shall have been subordinated to the security interest of the Collateral Trustee in such claim to the satisfaction of Lender. A claim shall cease to be an Allowed Pending Claim at such time as such claim or any portion thereof is rejected or disallowed (it being understood that a portion of any such claim may be withdrawn by Borrower or the amount of any such claim may be voluntarily reduced by Borrower and that such actions shall not be deemed to constitute rejection or disallowance thereof). Notwithstanding assignment to Lender or to the Collateral Trustee or other designee of the Lender of any such claims under a Designated Contract as contemplated in this Section 3.4, until such time as Lender, the Collateral Trustee or other such assignees shall acquire ownership thereof following default, Lender, the Collateral Trustee or other such assignees shall have no right to determine the manner in which collection or prosecution of such claims is conducted or to release or compromise any such claims, or to participate in any such collection, prosecution, release or compromise, all such rights to prosecute, release or compromise any such claims being vested solely in Borrower.

3.5 Reassignment of Assigned Receivables and Designated Contracts; Termination of Security Interest. At such time as all Obligations have been paid in full by Borrower and Lender shall have no further obligation or undertaking to make additional Advances under this Agreement, Lender shall execute and deliver to Borrower such instruments and documents (including, without limitation, such instruments and documents as are necessary to effect release of assignment of Designated Contracts and amounts payable thereunder, written notice of such release sufficient to comply with the requirements of the Assignment of Claims Act and the regulations thereunder, and Uniform Commercial Code Termination Statements) as shall be sufficient and appropriate to effect termination of the Assignment and the Lien of the Lender thereunder. In the event that at the time any such instrument or document shall be required to be executed and delivered hereunder the rights of Lender under this Agreement shall have been assigned, Lender shall be obligated to cause such instrument or document to be executed and delivered by such assignee. Lender shall have no responsibility with respect to the adequacy or the effectiveness of any such instrument or document. With respect to any such instruments of release or notices of release, other than Uniform Commercial Code Termination Statements, Lender shall have no responsibility for the preparation thereof.

12. Section 5.10 of the Loan Agreement is hereby amended to add at the end of said Section 5.10 an additional sentence to read as follows:

"In the event that Lender shall take possession of any Collateral, Lender will use reasonable care in the custody and preservation of such Collateral."

13. The following modification shall apply to the requirements concerning annual financial statements set forth in Section 6.1:

> The annual financial statements of Borrower required to be furnished pursuant to Section 6.1 shall be accompanied by the audit report and opinion of an independent certified public accountant or firm thereof with respect to such financial statements (in lieu of the compilation report or compilation letter specified in Section 6.1). Lender agrees that an audit report and opinion of Semple & Cooper, P.L.C., certified public accountants, will be sufficient for purposes of Section 6.1, but that the report and opinion of any other accountant or accounting firm will not satisfy the requirements of this provision until such accountant or accounting firm has been approved by Lender.

14. Subdivision (a) of Section 7.1 of the Loan Agreement is hereby amended to substitute the words "five (5) Business Days" for the words "three (3) Business Days" appearing in said Subdivision (a).

EXHIBIT C

# CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C.

## Government Receivables Financing Program

## PROMISSORY NOTE

7,500,000.00 August 24, 1998

**FOR VALUE RECEIVED,** the undersigned ("Borrower") promises to pay to the ·der of Classical Receivables Funding Company, L.L.C., a Tennessee limited liability ›mpany (herein the "Lender" and, along with each subsequent holder of this Note, :ferred to as the "Holder"), the principal sum of Seven Million Five Hundred Thousand ıd 00/100 Dollars ($7,500,000.00), or, if less, so much thereof as has been advanced ıd is outstanding on the date the principal sum hereof shall become due, with interest on ıe outstanding principal balance of this Note from the date hereof until fully paid as ereinafter provided.

Interest on the unpaid principal balance hereof from time to time outstanding shall ccrue from the Effective Advance Date with respect to each Advance hereunder through ıe Effective Credit Date for each repayment of principal hereof at a variable interest rate ıf two percent (2.0%) per annum above the prime rate for commercial loans as ˜nounced or quoted from time to time by First Union National Bank of North Carolina ,m its principal offices in Charlotte, North Carolina (the "Prime Rate").

For the purpose of determining the amount of interest payable hereunder, the term Advance" means the disbursement of funds by Lender to or for the account of Borrower o fund the loan evidenced hereby; the term "Effective Advance Date" for any Advance neans the Loan Period Commencement Date next preceding the date of such Advance ınless the date of such Advance is a Loan Period Commencement Date, in which case he Effective Advance Date shall be the date of such Advance; the term "Effective Credit Date" for repayment of the loan evidenced hereby in whole or part shall be the last day of he Loan Period when such repayment is received by Lender; the term "Loan Period Commencement Date" means the 15th day of each calendar month; and the term "Loan Period" means the period beginning on each Loan Period Commencement Date and ending on the day immediately preceding the next successive Loan Period Commencement Date.

Interest shall be computed on the principal balance hereunder outstanding at any time and from time to time on the basis of the actual number of days elapsed over a year of 360 days. Interest on the outstanding principal of the Loan is payable monthly, in advance, on the date of the initial Advance hereunder and on the same day of each succeeding month (or if a month has no corresponding day, the last day of such month). Each such date is herein called a "Loan Payment Date." The initial interest payment will ,ducted from the Advance with respect to which the interest is payable, and interest

advance, on each succeeding Loan Payment Date. If the Prime Rate changes during a month resulting in an increase or decrease in the amount of interest payable with respect to such month, any such increase shall be payable on the next succeeding Loan Payment Date and any decrease shall be credited to the interest payment due on the next succeeding Loan Payment Date. To the extent not previously paid, the outstanding principal hereof, all unpaid interest hereon, and all other obligations of Borrower with respect to the Loan (including, but not limited to, fees, costs and expenses) will be due and payable in full **ON DEMAND.**

Borrower may borrow up to the maximum principal amount above stated, repay all or any portion thereof and reborrow up to such amount on a revolving basis, except that Borrower shall not have the right to reborrow after demand for payment hereof in full. Such borrowings, to the extent not evidenced by other notes, shall be evidenced by this Note and subject to its terms.

Overdue payments of principal and (to the extent permitted by applicable law) interest shall bear interest at the interest rate then otherwise applicable to this Note plus five (5.0) percentage points from the date such amount became due to the Effective Credit Date for repayment of such overdue sum.

The principal hereof and interest hereon shall be payable in lawful money of the United States of America, at the offices of Classical Receivables Funding Company, L.L.C., 530 Oak Court Drive, Suite 400, Memphis, Tennessee 38117-3738, or at such other place as the Holder hereof may designate in writing to Borrower. Any payment by check or draft shall be subject to the condition that any receipt issued therefor shall be ineffective unless the amount due is actually collected by the Holder hereof.

Borrower shall pay a late payment charge of five percent (5%) of the amount then due and payable if any payment due under this Note is not received by Holder within ten (10) days after its due date. The late payment charge shall be payable to Holder **ON DEMAND.** All payments made under this Note may, in Holder's sole discretion, be applied first to late payment charges or other sums owed Holder, next to accrued and unpaid interest, and the balance to the repayment of principal, or in such other order or proportion as Holder, in its sole discretion, may elect from time to time.

This Note is secured by that certain Assignment and Security Agreement dated as of the date hereof (the "Security Agreement") executed by Borrower in favor of Lender, assigning to Lender, and granting to Lender a continuing, first-priority security interest in, Borrower's right, title and interest in and to all payments due and to become due to Borrower in respect of certain contracts and accounts receivable of Borrower more particularly described therein, to which reference is hereby made.

All parties liable for the payment of this Note agree to pay the Holder hereof reasonable attorneys' fees incurred by the Holder for the services of counsel employed to collect this Note, whether or not suit be brought, and whether incurred in connection with

ollect this Note, whether or not suit be brought, and whether incurred in connection with collection, trial, appeal, or otherwise, and to indemnify and hold the Holder harmless against liability for the payment of state intangible, documentary and recording taxes, and other taxes (including interest and penalties, if any) which may be determined to be payable with respect to this transaction.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by Borrower or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless Borrower shall notify the Holder, in writing, that Borrower elects to have such excess sum returned to it forthwith. It is the express intent hereof that Borrower not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by Borrower under applicable law.

The remedies of the Holder as provided herein and in any other documents governing or securing repayment hereof shall be cumulative and concurrent and may be pursued singly, successively, or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise.

No act of omission or commission of the Holder, including specifically any failure to exercise any right, remedy, or recourse, shall be effective unless set forth in a written document executed by the Holder, and then only to the extent specifically recited therein. A waiver or release with reference to one event shall not be construed as continuing, as a bar to, or as a waiver or release of any subsequent right, remedy, or recourse as to any subsequent event.

Borrower and all sureties, endorsers, and guarantors of this Note hereby (a) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note; or in enforcing any of its rights under any guaranties of payment hereof; (b) agree to any substitution, addition, or release of any collateral or any party or person primarily or secondarily liable hereon; (c) agree that the Holder shall not be required first to institute any suit, or to exhaust its remedies against Borrower or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note; (d) consent to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to any of them; and (e) agree that, notwithstanding the occurrence of any of the foregoing (except with the express written release by the Holder or any such person), they shall be and remain jointly and severally, directly and primarily, liable for all sums due under this Note.

Whenever used in this Note, the words "Borrower" and "Holder" shall be deemed to include the Borrower and the Holder named in the opening paragraph of this Note, and

respective heirs, executors, administrators, legal representatives, successors and permitted assigns.

Time is of the essence of this Note.

This Note is delivered to and accepted by Lender at its loan processing office located in the State of Georgia and shall be construed and enforced in accordance with the laws of the State of Georgia.

This Note may not be amended or modified except by an instrument in writing and signed by Borrower and the Holder.

The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time.

**IN WITNESS WHEREOF,** the undersigned Borrower has executed this instrument under seal as of the day and year first above written.

**BORROWER:**

AMERICAN RENOVATION &
CONSTRUCTION COMPANY, INC., a
California corporation

By: [signature]
Name: Anthony P. Dethloff
Title: Vice President/Advancement

[SEAL]

# CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C.

**Government Receivables Financing Program**

## PROMISSORY NOTE

**$15,000,000.00** **August 17, 1999**

**FOR VALUE RECEIVED,** the undersigned ("Borrower") promises to pay to the order of Classical Receivables Funding Company, L.L.C., a Tennessee limited liability company (herein the "Lender" and, along with each subsequent holder of this Note, referred to as the "Holder"), the principal sum of Fifteen Million and 00/100 Dollars ($15,000,000.00), or, if less, so much thereof as has been advanced and is outstanding on the date the principal sum hereof shall become due, with interest on the outstanding principal balance of this Note from the date hereof until fully paid as hereinafter provided.

Interest on the unpaid principal balance hereof from time to time outstanding shall accrue from the Effective Advance Date with respect to each Advance hereunder through the Effective Credit Date for each repayment of principal hereof at a variable interest rate of two percent (2.0%) per annum above the prime rate for commercial loans as announced or quoted from time to time by First Union National Bank of North Carolina from its principal offices in Charlotte, North Carolina (the "Prime Rate").

For the purpose of determining the amount of interest payable hereunder, the term "Advance" means the disbursement of funds by Lender to or for the account of Borrower to fund the loan evidenced hereby; the term "Effective Advance Date" for any Advance means the Loan Period Commencement Date next preceding the date of such Advance unless the date of such Advance is a Loan Period Commencement Date, in which case the Effective Advance Date shall be the date of such Advance; the term "Effective Credit Date" for repayment of the loan evidenced hereby in whole or part shall be the last day of the Loan Period when such repayment is received by Lender; the term "Loan Period Commencement Date" means the 15th day of each calendar month; and the term "Loan Period" means the period beginning on each Loan Period Commencement Date and ending on the day immediately preceding the next successive Loan Period Commencement Date.

Interest shall be computed on the principal balance hereunder outstanding at any time and from time to time on the basis of the actual number of days elapsed over a year of 360 days. Interest on the outstanding principal of the Loan is payable monthly, in advance, on the date of the initial Advance hereunder and on the same day of each succeeding month (or if a month has no corresponding day, the last day of such month). Each such date is herein called a "Loan Payment Date." The initial interest payment will be deducted from the Advance with respect to which the interest is payable, and interest accruing with respect to all subsequent monthly periods will be due and payable, in

advance, on each succeeding Loan Payment Date. If the Prime Rate changes during a month resulting in an increase or decrease in the amount of interest payable with respect to such month, any such increase shall be payable on the next succeeding Loan Payment Date and any decrease shall be credited to the interest payment due on the next succeeding Loan Payment Date. To the extent not previously paid, the outstanding principal hereof, all unpaid interest hereon, and all other obligations of Borrower with respect to the Loan (including, but not limited to, fees, costs and expenses) will be due and payable in full **ON DEMAND**.

Borrower may borrow up to the maximum principal amount above stated, repay all or any portion thereof and reborrow up to such amount on a revolving basis, except that Borrower shall not have the right to reborrow after demand for payment hereof in full. Such borrowings, to the extent not evidenced by other notes, shall be evidenced by this Note and subject to its terms.

Overdue payments of principal and (to the extent permitted by applicable law) interest shall bear interest at the interest rate then otherwise applicable to this Note plus five (5.0) percentage points from the date such amount became due to the Effective Credit Date for repayment of such overdue sum.

The principal hereof and interest hereon shall be payable in lawful money of the United States of America, at the offices of Classical Receivables Funding Company, L.L.C., 530 Oak Court Drive, Suite 400, Memphis, Tennessee 38117-3738, or at such other place as the Holder hereof may designate in writing to Borrower. Any payment by check or draft shall be subject to the condition that any receipt issued therefor shall be ineffective unless the amount due is actually collected by the Holder hereof.

Borrower shall pay a late payment charge of five percent (5%) of the amount then due and payable if any payment due under this Note is not received by Holder within ten (10) days after its due date. The late payment charge shall be payable to Holder **ON DEMAND.** All payments made under this Note may, in Holder's sole discretion, be applied first to late payment charges or other sums owed Holder, next to accrued and unpaid interest, and the balance to the repayment of principal, or in such other order or proportion as Holder, in its sole discretion, may elect from time to time.

This Note is secured by that certain Assignment and Security Agreement dated as of the date hereof (the "Security Agreement") executed by Borrower in favor of Lender, assigning to Lender, and granting to Lender a continuing, first-priority security interest in, Borrower's right, title and interest in and to all payments due and to become due to Borrower in respect of certain contracts and accounts receivable of Borrower more particularly described therein, to which reference is hereby made.

All parties liable for the payment of this Note agree to pay the Holder hereof reasonable attorneys' fees incurred by the Holder for the services of counsel employed to collect this Note, whether or not suit be brought, and whether incurred in connection with

collection, trial, appeal, or otherwise, and to indemnify and hold the Holder harmless against liability for the payment of state intangible, documentary and recording taxes, and other taxes (including interest and penalties, if any) which may be determined to be payable with respect to this transaction.

In no event shall the amount of interest due or payable hereunder exceed the maximum rate of interest allowed by applicable law, and in the event any such payment is inadvertently paid by Borrower or inadvertently received by the Holder, then such excess sum shall be credited as a payment of principal, unless Borrower shall notify the Holder, in writing, that Borrower elects to have such excess sum returned to it forthwith. It is the express intent hereof that Borrower not pay and the Holder not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by Borrower under applicable law.

The remedies of the Holder as provided herein and in any other documents governing or securing repayment hereof shall be cumulative and concurrent and may be pursued singly, successively, or together, at the sole discretion of the Holder, and may be exercised as often as occasion therefor shall arise.

No act of omission or commission of the Holder, including specifically any failure to exercise any right, remedy, or recourse, shall be effective unless set forth in a written document executed by the Holder, and then only to the extent specifically recited therein. A waiver or release with reference to one event shall not be construed as continuing, as a bar to, or as a waiver or release of any subsequent right, remedy, or recourse as to any subsequent event.

Borrower and all sureties, endorsers, and guarantors of this Note hereby (a) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest and all other notice, filing of suit, and diligence in collecting this Note; or in enforcing any of its rights under any guaranties of payment hereof; (b) agree to any substitution, addition, or release of any collateral or any party or person primarily or secondarily liable hereon; (c) agree that the Holder shall not be required first to institute any suit, or to exhaust its remedies against Borrower or any other person or party to become liable hereunder, or against any collateral in order to enforce payment of this Note; (d) consent to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice, consent, or consideration to any of them; and (e) agree that, notwithstanding the occurrence of any of the foregoing (except with the express written release by the Holder or any such person), they shall be and remain jointly and severally, directly and primarily, liable for all sums due under this Note.

Whenever used in this Note, the words "Borrower" and "Holder" shall be deemed to include the Borrower and the Holder named in the opening paragraph of this Note, and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns.

Time is of the essence of this Note.

This Note is delivered to and accepted by Lender at its loan processing office located in the State of Georgia and shall be construed and enforced in accordance with the laws of the State of Georgia.

This Note may not be amended or modified except by an instrument in writing and signed by Borrower and the Holder.

The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

All references herein to any document, instrument, or agreement shall be deemed to refer to such document, instrument, or agreement as the same may be amended, modified, restated, supplemented, or replaced from time to time.

**IN WITNESS WHEREOF,** the undersigned Borrower has executed this instrument under seal as of the day and year first above written.

**BORROWER:**

AMERICAN RENOVATION &
CONSTRUCTION COMPANY, INC., a
California corporation

By: ______________________
Name: Anthony P. Dethloff
Title: Vice President/Advancement

[SEAL]

**ENDORSEMENT**

FOR VALUE RECEIVED, pay to the order of Classical Financial Services, L.L.C.

CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C.

By: [signature] (SEAL)
Title: Operating Manager

**Acceptance page of Guarantors attached to and made a part of that certain Supplemental Commitment Letter for Accounts Receivable Financing dated July 10, 1999, from Classical Receivables Funding Company, L.L.C. to American Renovation & Construction Company.**

GUARANTOR:

______________________ Date: 7-14-, 1999
Name: Ivan Velasquez

______________________ Date: 7-14-99, 1999
Name: Anthony P. Dethlefs

______________________ Date: 7/14/99, 1999
Name: Kimberly K. McMahon

______________________ Date: July 14, 1999
Name: Francis N. Todd, II

______________________ Date: 7-14-99, 1999
Name: Blanche Richardson

______________________ Date: July 14, 1999
Name: Anthony J. Jemison

EXHIBIT E

000273825

# CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C.

## Government Receivables Financing Program

## ASSIGNMENT AND SECURITY AGREEMENT

dated as of

July 15, 1996

| | |
|---|---|
| LENDER: | Classical Receivables Funding Company, L.L.C., a Tennessee limited liability company |
| BORROWER: | American Renovation & Construction Company, a California corporation |
| BORROWER'S ADDRESS (CHIEF EXECUTIVE OFFICE): | 3645 Camino Del Rio South<br>San Diego, California 92108-4004<br>County: San Diego<br>Attention: Kimberly K. McMahon, Treasurer<br>Telecopy No. (619) 824-8120 |
| INITIAL COMMITMENT AMOUNT: | U.S. $2,000,000 |
| SERVICER: | Classical Receivables Funding Company, L.L.C. |
| SERVICER'S ADDRESS: | 4646 Poplar Avenue<br>Suite 213<br>Memphis, Tennessee 38117-4432<br>Attention: Dennis R. Terhune, Operating Manager<br>Telecopy No.: (901) 682-6022 |

THIS ASSIGNMENT AND SECURITY AGREEMENT ("Assignment") is made by and between the Borrower and the Lender identified on the cover page hereof. Capitalized terms used in this Assignment which appear on the cover page hereof shall have the meanings set forth on the cover page. Capitalized terms used in this Assignment (including the Preamble) and not otherwise defined or limited herein shall have the same meanings as are ascribed to such terms in the Loan Agreement hereinafter referred to.

## PREAMBLE

Pursuant to that certain Loan Agreement dated as of the date hereof (as the same may be amended, extended, supplemented or restated from time to time, the "Loan Agreement") between Lender and Borrower, Lender has agreed to extend certain financial accommodations to Borrower (the "Loan") in the maximum principal amount outstanding at any time equal to the Initial Commitment Amount in order to fund costs of Borrower associated with performance of one or more contracts for sale or lease of goods or for services to be rendered between Borrower and the United States of America or a department, agency or instrumentality thereof hereinafter identified (each a "Designated Contract" and collectively the "Designated Contracts").

The obligation of Borrower to repay the Loan is further evidenced by that certain Promissory Note dated the date hereof (as the same may be amended, extended, renewed, supplemented or restated from time to time, the "Note") issued by Borrower and payable to the order of Lender in the face principal amount outstanding at any time equal to the Initial Commitment Amount.

Under the terms of the Loan Agreement, the payment obligations of Borrower under the Note and the Loan Agreement and all other Obligations are to be secured by pledge and assignment by Borrower to Lender of one or more Designated Contracts hereinafter identified.

Pursuant to that certain Collateral Trust and Collection Agency Agreement dated as of July 15, 1996 (the "Collateral Trust Agreement"), between Lender and Reliance Trust Company, as Collateral Trustee (the "Collateral Trustee") and the Funding Source therein named (the "Funding Source"), Lender has pledged, assigned and granted a security interest to the Collateral Trustee in all of the right, title and interest of Lender in, to and under the Loan Agreement and the other Loan Documents, has endorsed the Note to the order of the Collateral Trustee, and has agreed to assign and pledge all of its rights, title and interest in and to this Assignment, the Designated Contracts herein identified and all other Collateral to the Collateral Trustee in order to secure obligations of Lender to the Funding Source by reason of advance of funds by the Funding Source to fund the Loan, and in order to provide for collection and application of Loan Payments, proceeds of the Designated Contracts and proceeds of all other Collateral in the manner and for the purposes herein provided.

Prior to delivery of a Request for Advance to Lender with respect to any Designated Contract, Borrower will execute and deliver to the Collateral Trustee a separate assignment of

such Designated Contract to the Collateral Trustee in such form as may be designated by Lender and the Collateral Trustee and complying with applicable requirements of the federal Assignment of Claims Act, 31 U.S.C. § 3727, *et seq.* (the "Assignment of Claims Act"), covering all unpaid amounts payable under the Designated Contract. Borrower acknowledges that the Collateral Trustee constitutes a financing institution participating in the financing of the Designated Contract within the meaning of the Assignment of Claims Act.

It is a condition to the making of the Loan and to Advance of funds thereunder (each such advance of Loan proceeds being herein called an "Advance") that Borrower execute and deliver the Note, this Assignment, the financing statements herein referred to and all other instruments and documents reasonably required by Lender to evidence, effect or secure the transactions herein contemplated (collectively, the "Loan Documents") to Lender.

**NOW, THEREFORE,** for and in consideration of the foregoing premises, the sum of Ten and No/100 Dollars ($10.00) in hand paid, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

1. Assignment. To secure all amounts due from Borrower under the Note from time to time and all other Obligations of Borrower now or hereafter arising under or in connection with this Assignment or any of the other Loan Documents to which Borrower is a party, or the transactions contemplated thereby, including, without limitation, sums herewith or to be advanced to Borrower for the account of Lender, and in accordance with the Assignment of Claims Act, Borrower hereby assigns to Lender, its successors and assigns, and grants to Lender and its successors and assigns a continuing security interest in, all right, title and interest which Borrower has and may in the future have in the following:

(a) *Designated Contracts.* The Designated Contract or Designated Contracts identified on Schedule 1 hereto attached and incorporated herein by this reference, (if any Designated Contract or Designated Contracts are identified on Schedule 1 hereto) and each Designated Contract which may be hereafter assigned by Borrower to Lender, its successors and assigns under the terms of any amendment or supplement to this Assignment, all sums, moneys and payments due and to become due to Borrower thereunder or by reason of the execution, delivery or performance by Borrower thereof including, without limitation, all amounts due or to become due to Borrower by reason of change orders, allowances, concessions, reimbursement of expenses, claims for breach of contract, late payment fees, or any other amounts payable thereunder, together with all cash and non-cash proceeds thereof and all returned, rejected or repossessed goods, the sale or lease of which shall have given or shall give rise to a payment obligation under such Designated Contract, and including specifically all amounts payable to Borrower from time to time by reason of statements or invoices issued and to be issued by Borrower from time to time for payments due under the Designated Contracts (collectively, the "Invoices") and all cash and non-cash proceeds thereof.

(b) *Accounts.* Without limitation to the foregoing, all accounts, accounts receivable, chattel paper, leases, promissory notes, contracts for receipt of money and evidences of indebtedness of or owing to Borrower whether now existing or hereafter arising, including, without limitation, all accounts and other rights to payment of money which arise or result from contracts for the sale or lease of goods or for services to be rendered by Borrower, all amounts due or to become due to Borrower by reason of change orders, allowances, concessions, reimbursement of expenses, claims for breach of contract, late payment fees, or any other amount payable thereunder, together with (i) all cash and non-cash proceeds thereof and (ii) any indemnity payment, guaranty payment, insurance payment or other award or settlement received by Borrower in satisfaction of the foregoing (herein generally referred to as "Accounts" and the person or persons obligated for the payment thereof to Borrower being herein generally referred to as "Account Debtors").

(c) *General Intangibles.* All general intangibles of Borrower, including, without limitation, all choses in action, causes of action, deposit accounts, goodwill, copyrights, registrations, licenses, tax refund claims, computer programs, claims under guarantees, security interests or other security held by or granted to Borrower to secure payment of any of the Accounts by an Account Debtor, all rights to indemnification, and all other intangible property of every kind and nature (the "General Intangibles").

(d) *Equipment.* All of Borrower's equipment, whether now owned or hereafter acquired, together with all replacements thereof and substitutions therefor, and all cash and non-cash proceeds and products thereof (the "Equipment").

The term "Collateral" as used herein means each and all of the items of Collateral herein described, and the term "Proceeds" as used herein includes all recoveries due and to become due from time to time by reason of any such Collateral, whether by reason of payment, collection, liquidation or settlement.

2. **Payment Direction to Agency.** Borrower hereby authorizes and directs the United States of America or the department, agency or instrumentality thereof which is obligated for the payment for the goods or services to be supplied by Borrower under a Designated Contract (the "Agency") to pay all the sums, moneys and payments required to be made with respect to such Designated Contract and all Invoices delivered from time to time thereunder directly to the Collateral Trustee and agrees to provide such notice or notices of such assignment to the Agency as Lender, the Servicer or the Collateral Trustee may request from time to time and as shall be necessary to comply with all requirements of the Assignments of Claims Act. Borrower acknowledges that under the terms of the Loan Agreement, such assignment to the Collateral Trustee and acknowledgement of such assignment by the Agency delivered to the Collateral Trustee is in all instances a condition precedent to the obligation of Lender to make an Advance under the Loan Agreement with respect to any such Designated Contract or any Invoice issued thereunder or pertaining thereto.

3. **Application of Payments on Assigned Receivables.** The Loan shall bear interest as provided in the Note and be subject to certain fees, expenses and other costs, all as more particularly set forth in the Loan Agreement. Upon its receipt from the Agency of payments in respect of the Invoices assigned pursuant hereto, Lender at its option and in its sole discretion may apply the total amount received pursuant to an Invoice assigned to the Collateral Trustee as herein contemplated (the "Invoice Proceeds") to the reduction of the Obligations of Borrower, including interest, fees, expenses, commissions and other charges, from or relating to Advances made with respect to any other Invoice or Invoices, in whole or in part. The failure to apply the Invoice Proceeds to any Obligations of Borrower or disbursement of funds to Borrower notwithstanding other outstanding Obligations shall in no way diminish or impair the obligation of Borrower to pay the same in accordance with the terms of the Loan Agreement and the other Loan Documents.

4. **Borrower's Warranties and Representations.** To induce Lender to advance funds to Borrower, and with full knowledge that the truth and accuracy of the following are being relied upon by Lender, the Funding Source and the Collateral Trustee, Borrower hereby warrants and represents to Lender:

(a) That each Designated Contract is a valid, binding and legally enforceable obligation of the parties thereto;

(b) That, with respect to each Invoice assigned to Lender pursuant to this Assignment, each and every obligation of Borrower under the Designated Contract pursuant to which such Invoice was issued (the "Related Contract") for which payment is requested in such Invoice has been fully and satisfactorily completed and performed; that the Related Contract and Borrower's Invoice for the same have been validly accepted and certified by the Agency as fully and satisfactorily completed and that the Agency has authorized payment of the same; and that Borrower is entitled to full and timely payment under the terms of Related Contract pertaining to such Invoice of the portion of the Contract Price covered by such Invoice;

(c) That Borrower has advised and directed the Agency to pay all sums due or to become due under the Designated Contract directly to the Collateral Trustee;

(d) That Borrower has full lawful authority to enter into this Assignment and that it is not a party to or bound by any contract, agreement, obligation, statute, regulatory provision or other restriction which would prevent, prohibit or adversely affect its ability to carry out the terms and provisions of this Assignment;

(e) That (i) Borrower is the owner of all rights, title and interest in and to any and all payments due and to become due under each Designated Contract, free and clear of any and all Liens whatsoever; (ii) it has not previously assigned, encumbered or in any way impaired its rights under any Designated Contract, and has not impaired any security

given thereunder; and (iii) it has the full lawful right and authority to assign its right to payments due under such Designated Contract to Lender;

(f) That all subcontractors, materialmen and laborers of Borrower under the Designated Contract have been paid in full or will be paid in full out of the sums to be advanced to Borrower by Lender with respect to such Designated Contract under the Loan Agreement and that there are no setoffs, holdbacks, adjustments, qualifications, claims or reductions of any nature whatsoever which may validly be asserted by the Agency, a surety of Borrower or any other party against the proceeds of the Designated Contract;

(g) That there are no sureties on a bond on the Designated Contract other than those sureties which have been disclosed in writing to Lender; and

(h) That the assignment evidenced by this Assignment is irrevocable by Borrower for the period beginning on the Agreement Date and ending at such time as this Assignment has terminated, all Obligations have been paid in full by Borrower and Lender shall have no obligation to make Advances under the Loan Agreement, and payment to anyone other than the Collateral Trustee shall not constitute payment of Borrower's account with Lender.

Borrower further warrants that sufficient funds have been appropriated to the Agency to enable the Agency to satisfy its obligations under the Designated Contract and that there are no adjustments, holdbacks, setoffs, reductions or qualifications of any kind applicable to Borrower's account with the Agency. Borrower shall notify Lender immediately upon the occurrence of any event that might in any way impair or adversely affect Borrower's or Lender's interest in the Designated Contract.

5. **Effect of Termination of Commitment.** In the event the Commitment established under the Loan Agreement is cancelled or terminated, such cancellation or termination shall not affect the rights or obligations of the parties under this Assignment with respect to any Obligations of Borrower then outstanding, and this Assignment shall remain in full force and effect until Borrower's Obligations have been fully satisfied.

6. **Security Interest Documentation.** As a further condition to Lender's obligation to fund any Advance to Borrower, Borrower shall have executed and delivered to Lender original UCC-1 financing statements (collectively, the "Financing Statements") designating Borrower as debtor, Lender as secured party, and the Collateral Trustee as assignee, evidencing the security interest in the Collateral granted to Lender hereunder, and such Financing Statements shall have been filed with the appropriate filing officer in the jurisdiction where Borrower's chief executive office is located, in each jurisdiction in which Borrower will perform any portion of the Designated Contract and in any other jurisdiction required by Lender or the Collateral Trustee. Lender shall be entitled to file and record the Financing Statements with any appropriate governmental agencies for the purpose of perfecting its security interests made by

this Assignment. Borrower hereby authorizes Lender to file a photostatic or photographic copy or other optical image reproduction of any Financing Statement executed by Borrower in any jurisdiction or filing office which Lender or the Collateral Trustee shall determine to be necessary or appropriate to perfect or continue perfection of the security interest in the Collateral granted to Lender hereunder with the same effect as though such photostatic or photographic copy or optical image reproduction constituted an original Financing Statement executed by Borrower, as debtor, and hereby grants a power of attorney to Lender and to the Collateral Trustee, or either of them acting separately, to execute in its behalf such other or additional Financing Statements as Lender, the Collateral Trustee, or either of them, shall deem appropriate and which contain a description of Collateral substantially the same as the description of Collateral contained in any Financing Statement executed on behalf of Borrower or as is set forth in this Assignment and any amendment or supplement thereto, for filing in any jurisdiction required by Lender or the Collateral Trustee or in order to correct or replace any defective or incomplete Financing Statement executed by Borrower. Borrower further agrees to perform such other acts and to execute such further documents, all at its sole cost and expense, as Lender may consider to be necessary or advisable to further evidence or secure for Lender and the Collateral Trustee the interests of Borrower assigned hereunder. Borrower hereby grants a power of attorney to Lender and to the Collateral Trustee, or either of them acting separately, to execute in its behalf amended Financing Statements and other security documents as Lender or the Collateral Trustee deems to be necessary or appropriate to evidence the interest of Lender and the Collateral Trustee in the Collateral or any part thereof, which power of attorney shall be irrevocable and coupled with an interest. Borrower agrees to provide Lender with a true and correct copy of each Invoice issued after the date of this Assignment and to be assigned to the Collateral Trustee. Borrower further agrees that the security interest granted to Lender hereunder and the Financing Statements executed simultaneously herewith shall cover and include each Invoice issued by Borrower pursuant to the Designated Contract at any time. Borrower shall further execute and deliver to the Collateral Trustee a notice of assignment to be provided to the Agency and any sureties, if any, on each Designated Contract.

7. **Failure of the Agency to Make Payment on the Designated Contract.** In the event the Agency shall refuse or fail, for whatever reason, to make the payments or any part of the payments to the Collateral Trustee required of the Agency under the Designated Contract, Lender shall have full recourse against Borrower, and Borrower shall promptly, upon written notice from Lender, pay and transfer to Lender an amount equal to all Obligations then outstanding with respect to such Designated Contract.

8. Recourse. In the event any Invoice is not paid by the Agency and received by the Collateral Trustee on or before the earlier of seventy-five (75) days after the original due date of such Invoice and one hundred five (105) days after the date of such Invoice, then at Lender's sole discretion, Borrower shall immediately either pay the entire amount owing to the Collateral Trustee with respect to such Invoice or deliver to Lender one or more additional Invoices issued under such Designated Contract and assigned to the Collateral Trustee as shall be acceptable to Lender, of equal or greater amount than the Invoice(s) being replaced. The replacement Invoice(s) shall be subject to all the terms and conditions of this Assignment.

9. **Limitation of Assignment.** Nothing in this Assignment shall constitute or be construed as an assignment to or assumption by Lender or the Collateral Trustee of Borrower's obligations and duties to perform and fulfill the terms and conditions imposed upon Borrower under the Designated Contract.

10. **Indemnification.** Borrower hereby agrees to indemnify and hold Lender, the Collateral Trustee, the Servicer and each Funding Source, and their respective officers, directors, affiliates and assigns (each an "Indemnified Party") harmless from any and all claims, losses, damages or liabilities, of whatever nature, to which an Indemnified Party may become subject, together with any and all costs, settlements, and expenses associated with such claims, losses, damages or liabilities, including reasonable attorneys fees and expenses, arising from or based, in whole or in part, upon (i) the failure or refusal, for whatever reason, of the Agency to pay to the Collateral Trustee on a timely basis any and all amounts due under any Designated Contract; (ii) any claims of any surety of Borrower, or any other party, to all or any portion of amounts paid or payable under any Designated Contract; or (iii) any representation, warranty, agreement or covenant of Borrower contained in or made in connection with this Assignment proving to have been false, inaccurate or misleading when made. All attorneys fees and expenses to be paid hereunder, to the extent permitted by applicable law, shall be paid without any reduction or setoff for any reason, including specifically the success of any counterclaim or defense to enforcement of this Assignment, or any other claim of Borrower against any Indemnified Party.

11. **Power of Attorney.** Borrower irrevocably appoints Lender, its successors and assigns, the attorney-in-fact for Borrower, with full power of substitution and revocation, at the expense of Borrower and in its name or otherwise, to collect, sue for, receive, and furnish receipts for the moneys or any part therefor due under each Designated Contract; to negotiate by endorsement or otherwise in the name of Borrower by or for Lender's benefit all instruments, whether negotiable or not, including checks, drafts, and notes; to execute in its behalf amended financing statements and other security documents as Lender deems to be necessary or appropriate to evidence or secure Borrower's interest; and to settle or discontinue any proceedings pertaining to this Assignment. Such power of attorney is coupled with an interest and shall be irrevocable for the period beginning on the Agreement Date and ending at such time as this Assignment has terminated, all Obligations have been paid in full by Borrower and Lender shall have no obligation or undertaking to make additional Advances under the Loan Agreement. Borrower acknowledges and agrees that all checks, drafts and notes received by Lender which are made payable to the joint order of Borrower and Lender, or otherwise, will be negotiated by Lender pursuant to the terms of this paragraph and applied pursuant to the provisions of this Assignment and the Loan Agreement.

12. **Waiver.** The failure of either party to enforce at any time or for any period the provisions of this Assignment shall not be construed as a waiver of such provisions or of the right of the party thereafter to enforce each and every provision contained herein. The waiver of any default or the failure to exercise any of the foregoing rights shall not be deemed to be a waiver of any subsequent default or a waiver of the right to exercise any right granted.

13. **Severability.** In the event that any provision in this Assignment is declared void or unenforceable by any court of competent jurisdiction, such declaration shall not affect the enforceability of any other provision of this Assignment, it being intended that the provisions of this Assignment shall be severable and shall apply as if any such void or unenforceable provision had not been included herein.

14. **Enforceability; Amendment.** No amendment, alteration, or modification of any of the provisions of this Assignment shall be binding unless agreed to in writing and signed by the parties hereto.

15. **Assignment to Collateral Trustee for Benefit of Funding Source.** Lender and Borrower each acknowledge and agree that Lender will assign and transfer the Loan and all rights of Lender thereunder and to the security therefor (including specifically the rights of Lender under this Assignment, and all rights of Lender with respect to each Designated Contract assigned to Lender hereunder and which may hereafter be assigned by Borrower to Lender under the terms of any amendment or supplement to this Assignment, and all other Collateral), to the Collateral Trustee as collateral trustee or collateral agent for the benefit of the Funding Source, as security for obligations of Lender to the Funding Source and for the purposes contemplated in the Collateral Agreement. The parties hereto agree that following any such assignment by Lender to the Collateral Trustee, in the event that Borrower shall receive written notice from Lender which states that the Collateral Trustee has exercised its right to assume the rights, powers and privileges of Lender under this Assignment (such notice being herein called a "Notice of Exercise"), all rights, powers and privileges of Lender under this Assignment shall inure to the benefit of and be exercisable by the Collateral Trustee, no rights or privileges afforded to or vested in Lender under this Assignment shall be exercisable by Lender without the approval or consent of the Collateral Trustee, and from and after receipt by Borrower of such Notice of Exercise and thereafter until such time as Borrower shall receive a written notice executed by the Collateral Trustee that any such Notice of Exercise has been rescinded or withdrawn, the Collateral Trustee shall be deemed to be the "Lender" for all purposes under this Assignment and Borrower shall not be entitled to rely on any action taken by Lender which is required or permitted hereunder unless taken by or with the express written consent of the Collateral Trustee.

16. **Further Assignment.** Notwithstanding anything herein to the contrary, Lender shall be entitled to assign this Assignment and its interest in the Designated Contracts to any third party in accordance with and subject to the limitations of Subpart 32.8 of the Federal Acquisition Regulations without the necessity of notice to or consent of Borrower. Borrower agrees to promptly execute any documents and to take such further steps as may be deemed necessary by Lender in connection with any assignment or reassignment of this Assignment, all at Borrower's sole cost and expense.

17. **Taxpayer Identification Number of Borrower.** Borrower certifies and acknowledges that the number set forth below immediately following the signature of Borrower to this Assignment as the taxpayer identification number of Borrower is accurate and agrees that

Lender shall be authorized, without further direction or consent of Borrower, to include such taxpayer identification number of Borrower in any financing statement, amendment, continuation statement, assignment, release or termination statement which is required or permitted to state the taxpayer identification number of Borrower.

18. **Entire Agreement.** This Assignment and the other Loan Documents contain the entire agreement between Borrower and Lender and, when effective, supersede and cancel all prior agreements between the parties with respect to the subject matter hereof; provided, however, that all assignment and funding agreements between the parties relating to Designated Contracts other than the Designated Contract or Designated Contracts identified in Schedule 1 hereto shall remain in full force and effect; and provided further, that all Financing Statements (and all amendments, assignments and continuations thereof) designating Borrower as debtor thereunder and Lender or the Collateral Trustee as the secured party thereunder shall not be affected by execution and delivery of this Assignment.

19. **Additional Provisions and Terms.** The additional provisions and terms set forth in Schedule 2 hereto (if any) shall apply in all instances to this Assignment and the interpretation of the provisions hereof and are hereby incorporated herein by reference and shall for all purposes constitute a part of this Assignment. In the event of inconsistency between the additional provisions and terms (if any) set forth on Schedule 2 hereto and the provisions of the Assignment contained in Paragraph 1 through Paragraph 18 hereof, the provisions and terms set forth on said Schedule 2 shall govern the application and interpretation of this Assignment.

**IN WITNESS WHEREOF,** Borrower has executed this Agreement or caused it to be executed under seal by its duly authorized officers, all as of the day and year first above.

BORROWER:

AMERICAN RENOVATION & CONSTRUCTION COMPANY

By: *[signature]*
Name: Anthony P. Dethloff
Title: Vice President/Advancement

Attest: *Anthony J. Jemison*
Name: Anthony J. Jemison
Title: Secretary

[SEAL]

Taxpayer Identification Number of Borrower: 33-0260362

ACCEPTED:

LENDER:

CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C.

By: *Cecil E. Anthony*
Name: *Cecil E. Anthony*
Title: *Manager*
Date: *August 22*, 19*96*

[Assignment and Security Agreement]
00273825.W51

# SCHEDULE I
# TO
# ASSIGNMENT AND SECURITY AGREEMENT
(Page 1 of 4)

Description of Designated Contract(s)

Assigned on Date of Settlement (if any)

| | |
|---|---|
| Agency (the "Agency"): | Department of the Navy |
| Address: | Officer in Charge of Construction<br>Jacksonville Area<br>Box 139, Naval Air Station<br>Jacksonville, FL 32212-0139 |
| Government Contract No: | N62467-94-C-2570 |
| Description: | Reroof warehouse buildings 162 and 164, Naval Air Station, Jacksonville |
| Contract Date: | 9/30/94 |
| Contract Price: | $1,682,000.00 |

* * *

| | |
|---|---|
| Agency (the "Agency"): | Department of the Navy |
| Address: | Navy Public Works Center Jacksonville<br>Jacksonville, FL 32212-0030 |
| Government Contract No: | N68931-95-D-8374 |
| Description: | Roof repair, various locations, Navy Public Works Center Jacksonville |
| Contract Date: | 11/21/95 |
| Contract Price: | $3,992,585.00 (estimated amount) |

SCHEDULE 1
TO
ASSIGNMENT AND SECURITY AGREEMENT
(Page 2 of 4)

Description of Designated Contract(s)

Assigned on Date of Settlement (if any)

| | |
|---|---|
| Agency (the "Agency"): | Department of the Navy |
| Address: | Naval Facilities Engineering Command<br>Contracts Department<br>1220 Pacific Highway, Building 127<br>San Diego, CA 92132-5187 |
| Government Contract No: | N68711-93-C-1409 |
| Description: | Wholesale repairs and revitalization, FY94 Military Housing Project H394, Silver Strand, Phase I, San Diego, CA |
| Contract Date: | 7/29/94 |
| Contract Price: | $5,326,406.00 |

* * *

| | |
|---|---|
| Agency (the "Agency"): | Department of the Army |
| Address: | U.S. Army Engineer District, Sacramento<br>Corps of Engineers<br>1325 J Street<br>Sacramento, CA 95814-2922 |
| Government Contract No: | DACA05-94-C-0077 |
| Description: | Reroof Building No. 508, Sharpe Site, Lathrop, CA |
| Contract Date: | 9/28/94 |
| Contract Price: | $1,070,316.00 |

SCHEDULE 1
TO
ASSIGNMENT AND SECURITY AGREEMENT
(Page 3 of 4)

Description of Designated Contract(s)

Assigned on Date of Settlement (if any)

| | |
|---|---|
| Agency (the "Agency"): | Department of the Army |
| Address: | U.S. Army Engineer District, Sacramento<br>Corps of Engineers<br>1325 J Street<br>Sacramento, CA 95814-2922 |
| Government Contract No: | DACA05-94-C-0102 |
| Description: | Reroof Buildings 286 and 386, DDRW Sharpe Site, California |
| Contract Date: | 9/28/94 |
| Contract Price: | $2,834,000 (as modified by Modification No. P00002) |

* * *

| | |
|---|---|
| Agency (the "Agency"): | Mesa Grande Indian Housing Authority |
| Address: | 4040 30th, Suite 204<br>San Diego, CA 92104 |
| Government Contract No: | CA 148-1 |
| Description: | Construction of Fifteen Low Rent Dwelling Units on the Mesa Grande Indian Reservation |
| Contract Date: | __________ |
| Contract Price: | $________ |

# SCHEDULE 1
# TO
# ASSIGNMENT AND SECURITY AGREEMENT
(Page 4 of 4)

<u>Description of Designated Contract(s)</u>

<u>Assigned on Date of Settlement (if any)</u>

| | |
|---|---|
| Prime Contractor: | SUNDT/ACTUS/IBC, A Joint Venture |
| Address: | P. O. Box 26685<br>Tucson, AZ 85726 |
| Subcontract No: | GM-8014 |
| Description: | 300 Family Housing Units, PWC, Guam |
| Subcontract Date: | 1/13/95 |
| Subcontract Price: | $2,935,169.00 |
| Prime Contract No: | N62742-93-C-0605 |
| Prime Contract Date: | 3/25/94 |

SCHEDULE 2
TO
ASSIGNMENT AND SECURITY AGREEMENT
(Page 1 of 1)

Additional terms and provisions of this Assignment and Security Agreement are as follows:

None

00273825.W51

EXHIBIT F

## ASSIGNMENT OF LOAN DOCUMENTS

For and in consideration of the sum of one dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, **Classical Receivables Funding Company, L.L.C.**, a Tennessee limited liability company ("Assignor"), whose mailing address is 530 Oak Court Drive, Suite 400, Memphis, Tennessee 38117, does hereby, through its duly appointed and authorized officers, bargain, sell, give, grant, convey, transfer, set over and assign, WITHOUT RECOURSE, to **Classical Financial Services, L.L.C.**, a Tennessee limited liability company, its successors and assigns, all of Assignor's rights, title and interest in, to and under the following instruments and documents:

i) that certain Promissory Note, dated as of July 15, 1996, executed by American Renovation & Construction Company ("Borrower") in favor of Assignor in the original principal amount of $2,000,000.00 (the "Note"), evidencing indebtedness now existing or hereafter arising, including all renewals, modifications and extensions thereof;

ii) that certain Loan Agreement, dated of even date as the Note, executed by Borrower to Assignor;

iii) that certain Assignment and Security Agreement dated of even date as the Note, executed by Borrower to Assignor; and

iv) all of Assignor's "Loan Documents". For the purposes hereof, "Loan Documents" shall mean all documents currently in the possession of Assignor or hereafter acquired, pertaining to the loan evidenced by the Note, as well as all future advances, renewals, modifications and extensions thereof including, but not limited to, loan agreements, guaranties, security agreements, affidavits and certificates, general credit information, credit records from Assignor, payment histories, signed loan applications, appraisals and insurance policies.

**IN WITNESS WHEREOF**, said Assignor has caused this Assignment to be executed as of the 22nd day of August, 1996.

**ASSIGNOR:**

**Classical Receivables Funding Company, L.L.C.,**
**a Tennessee limited liability company**

By: Dennis R. Terhune
**Dennis R. Terhune, Operating Manager**

rtc:\scholl\classical financial\assignment of loan docs

EXHIBIT G

15:01 FAX

004

# INSTRUMENT OF ASSIGNMENT

REFERENCE CONTRACT NUMBER: F08602-99-CK006 ("Contract")

KNOW ALL MEN BY THESE PRESENTS: That AMERICAN RENOVATION & CONSTRUCTION COMPANY, 3645 Camino Del Rio South, San Diego California 92108-4004, for value received and in accordance with the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 3727, 41 U.S.C. Section 15), the undersigned Contractor, as Assignor, does hereby assign, set over, and transfer unto CLASSICAL FINANCIAL SERVICES, L.L.C., 530 Oak Court Drive, Suite 400, Memphis, Tennessee 38117, as Assignee, all of Assignor's right, title and interest to all payments, from the Department Of The Air Force, 6th Air Refueling Wing, or from any agency or department accruing under the above referenced contract. Assignor acknowledges that upon delivery by the Assignee to said agency of a Notice of Assignment with respect to said contract, all payments due or to become due under said contract are to be made to the Assignee.

The Assignee shall not be held responsible for the performance of any work or for the manufacture or delivery of any of the items mentioned in said Contract.

ATTEST:

By: [signature]
Name: Treasurer
Title: Kim McMahon

(SEAL)

AMERICAN RENOVATION & CONSTRUCTION COMPANY
(Assignor)

By: [signature]
Tony Dethloff, Vice President
Date: 9-16-99

Assignment accepted at Memphis, Tennessee this 17th day of September 1999.

CLASSICAL FINANCIAL SERVICES, L.L.C.
(Assignee)

By: Dennis R Terhune
Dennis R. Terhune
Title: Chief Manager

Sworn and subscribed before me by the foregoing named officer of Classical Financial Services, L.L.C. this 17th day of Sept, 1999, at Memphis, Tennessee.

[signature]
Notary Public July 9 2002
(SEAL)

# NOTICE OF ASSIGNMENT

To: Contracting Officer
Department Of The Air Force
6th Contracting Squadron/LGCC
2606 Brown Pelican Avenue
MacDill AFB, Florida 33621-5000

This has reference to Contract No. F08602-99-CK006 dated March 31, 1999, entered into between AMERICAN RENOVATION & CONSTRUCTION COMPANY, 3645 Camino Del Rio South, San Diego, California 92108-4004 (hereinafter, the "Assignor") and the Department Of The Air Force to construct JNCO Family Housing Units, Phases III and IV.

PLEASE TAKE NOTICE that moneys due or to become due under the contract described above have been assigned to the CLASSICAL FINANCIAL SERVICES, L.L.C., (hereinafter, the "Assignee"), pursuant to the provisions of the Assignment of Claims Act of 1940, as amended (31 U.S.C. Section 3727, 41 U.S.C. Section 15) and the Federal Acquisition Regulations ("FAR") relating thereto (48 U.S.C. Subsections 32.800-32.806).

A true copy of the Instrument of Assignment executed by the Assignor on September 16,1999 is attached to the original hereof.

Payments due or become due under Contract should be made to the assignee as follows: checks should be made payable to CLASSICAL FINANCIAL SERVICES, L.L.C., (CAGE Code: 1H2R3) and remitted to the Assignee at: CLASSICAL FINANCIAL SERVICES, L.L.C., P.O. Box 281370, Atlanta, Georgia 30384-1370.

Please return to the undersigned at your earliest convenience the three enclosed copies of this Notice with appropriate notations showing the date and hour of receipt, and duly signed by the person acknowledging receipt on behalf of the addressee.

By: *Dennis R. Terhune*
Dennis R. Terhune
Title: Chief Manager
CLASSICAL FINANCIAL SERVICES, L.L.C.

Receipt is hereby acknowledged of the above Notice and a copy of the above mentioned Instrument of Assignment. These were received at ____________ a.m/p.m. on __________________________, 2000.

DEPARTMENT OF THE AIR FORCE
6TH CONTRACTING SQUADRON/LGCC

______________________________
(Signature)

______________________________
(Title)

EXHIBIT H

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 31 2004

LUTHER D. THOMAS, Clerk
By: Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLASSICAL FINANCIAL SERVICES, L.L.C.,

Plaintiff,

v.

AMERICAN RENOVATION & CONSTRUCTION COMPANY, INC.,

Defendant.

CIVIL ACTION
FILE NO. 1:00-CV-1114 (WBH)

AMERICAN RENOVATION AND CONSTRUCTION COMPANY, INC., IVAN VELASQUEZ, ANTHONY DETHLOFF, ANTHONY J. JEMISON, KIMBERLY McMAHON, and BLANCHE RICHARDSON,

Counterclaimants,

v.

DENNIS R. TERHUNE, CLASSICAL FINANCIAL SERVICES, L.L.C., CLASSICAL RECEIVABLES FUNDING COMPANY, L.L.C., CASH FLOW MANAGEMENT, L.P., and COMMERCIAL CAPITAL, INC.,

Counterclaim Defendants.

ATTEST: A TRUE COPY
CERTIFIED THIS

NOV 3 - 2004

Luther D. Thomas, Clerk
By: Deputy Clerk

## FINAL CONSENT ORDER AND JUDGMENT

With the consent of all parties hereto, it is hereby ORDERED and ADJUDGED as follows:

1. Barbara Terhune, as executrix of the Estate of Dennis R. Terhune, is hereby substituted for Dennis R. Terhune as the proper party in this action.

2. JUDGMENT is hereby entered in favor of Plaintiff Classical Financial Services, L.L.C., and against Defendant American Renovation and Construction Company, Inc., on Count I of the Complaint in the amount of SEVENTEEN MILLION DOLLARS ($17,000,000.00).

3. Count II of the Complaint (Foreclosure of Security Agreement and Possession of Collateral) and Count IV (Conversion) are hereby dismissed **without** prejudice, and all other claims in this action, including without limitation all remaining claims of Plaintiff and any and all counterclaims asserted by any party are hereby dismissed **with** prejudice.

4. Each party shall bear their own costs and attorney's fees.

SO ORDERED this 31 day of August, 2004.

Willis B. Hunt, Jr.
Judge, United States District Court

**(SIGNATURES CONTINUED ON FOLLOWING PAGE)**

Consented to by:

Henry L. Klein
Tennessee Bar No. 8856

APPERSON, CRUMP, & MAXWELL PLC
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
(901) 756-6300

Attorneys for Dennis R. Terhune, Classical Financial Services, L.L.C., and Classical Receivables Funding Company, L.L.C.

Dennis A. Brown
Georgia Bar No. ________

Finley & Buckley, P.C.
2931 North Druid Hills Road
Suite C
Atlanta, Georgia 30329
(404) 320-9979

Attorney for Classical Financial Services, L.L.C.

William C. Collins
Georgia Bar No. 178847

BURR & FORMAN LLP
600 West Peachtree Street
Suite 1200, One Georgia Center
Atlanta, Georgia 30308
(404) 815-3000

Attorney for Cash Flow Management L.P. and Commercial Capital, Inc.

Dan Campbell
Arizona Bar No. ________

Bell, O'Connor & Campbell, P.C.
City Square Plaza, Suite 1800
3838 North Central Avenue
Phoenix, Arizona 85012
(602) 241-7000

Attorney for Defendant/ Counterclaimants/Counter-Defendants

Consented to by:

Dennis A. Brown
Georgia Bar No. 086986

Finley & Buckley, P.C.
2931 North Druid Hills Road
Suite C
Atlanta, Georgia 30329
(404) 320-9979

Attorney for Classical Financial Services, L.L.C.

Henry L. Klein
Tennessee Bar No. 8856

APPERSON, CRUMP, & MAXWELL PLC
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
(901) 756-6300

Attorneys for Dennis R. Terhune, Classical Financial Services, L.L.C., and Classical Receivables Funding Company, L.L.C.

William C. Collins
Georgia Bar No. 178847

BURR & FORMAN LLP
600 West Peachtree Street
Suite 1200, One Georgia Center
Atlanta, Georgia 30308
(404) 815-3000

Attorney for Cash Flow Management L.P. and Commercial Capital, Inc.

Dan Campbell
Arizona Bar No. ____________

Bell, O'Connor & Campbell, P.C.
City Square Plaza, Suite 1800
3838 North Central Avenue
Phoenix, Arizona 85012
(602) 241-7000

Attorney for Defendant/Counterclaimants/Counter-Defendants

Stuart F. Clayton, Jr.
Georgia Bar No. ____________

Lamberth, Bonapfel, Cifelli & Stokes, P.A.
Atlanta Financial Center
3343 Peachtree Road, N.E.
Suite 550
Atlanta, Georgia 30326-1009

Lesa Christensen
California Bar No. __________

Ashworth, Blanchet, Christensen & Kalemkrarvan
610 West Ash Street, Suite 800
San Diego, California 92101
(619) 234-8585

Consented to by:

Dennis A. Brown
Georgia Bar No. ___________

Finley & Buckley, P.C.
2931 North Druid Hills Road
Suite C
Atlanta, Georgia 30329
(404) 320-9979

Attorney for Classical Financial Services, L.L.C.

Henry L. Klein
Tennessee Bar No. 8856

APPERSON, CRUMP, & MAXWELL PLC
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
(901) 756-6300

Attorneys for Dennis R. Terhune, Classical Financial Services, L.L.C., and Classical Receivables Funding Company, L.L.C.

William C. Collins
Georgia Bar No. 178847

BURR & FORMAN LLP
600 West Peachtree Street
Suite 1200, One Georgia Center
Atlanta, Georgia 30308
(404) 815-3000

Attorney for Cash Flow Management L.P. and Commercial Capital, Inc.

Dan Campbell
Arizona Bar No. 005395

Bell, O'Connor & Campbell, P.C.
City Square Plaza, Suite 1800
3838 North Central Avenue
Phoenix, Arizona 85012
(602) 241-7000

Attorney for Defendant/Counterclaimants/Counter-Defendants

Consented to by:

______________________
Dennis A. Brown
Georgia Bar No. ________

Finley & Buckley, P.C.
2931 North Druid Hills Road
Suite C
Atlanta, Georgia 30329
(404) 320-9979

Attorney for Classical Financial Services, L.L.C.

______________________
Henry L. Klein
Tennessee Bar No. 8856

APPERSON, CRUMP, & MAXWELL PLC
6000 Poplar Avenue, Suite 400
Memphis, Tennessee 38119
(901) 756-6300

Attorneys for Dennis R. Terhune, Classical Financial Services, L.L.C., and Classical Receivables Funding Company, L.L.C.

______________________
William C. Collins
Georgia Bar No. 178847

BURR & FORMAN LLP
600 West Peachtree Street
Suite 1200, One Georgia Center
Atlanta, Georgia 30308
(404) 815-3000

Attorney for Cash Flow Management L.P. and Commercial Capital, Inc.

______________________
Dan Campbell
Arizona Bar No. ________

Bell, O'Connor & Campbell, P.C.
City Square Plaza, Suite 1800
3838 North Central Avenue
Phoenix, Arizona 85012
(602) 241-7000

Attorney for Defendant/Counterclaimants/Counter-Defendants

Stuart F. Clayton, Jr.
______________________
Stuart F. Clayton, Jr.
Georgia Bar No. 129743

Lamberth, Cifelli, Stokes & Stout P.A.
3343 Peachtree Road, N.E.
Suite 550
Atlanta, Georgia 30326-1009
(404) 262-7373

Attorney for Defendants/Counter-claimants/Counter-Defendants

______________________
Lesa Christensen
California Bar No. ________

Ashworth, Blanchet, Christensen & Kalemkrarvan
610 West Ash Street, Suite 800
San Diego, California 92101
(619) 234-8585

Attorney for Defendants/Counter-claimants/Counter-Defendants

Lesa Christensen
California Bar No. 120493

Ashworth, Blanchet, Christensen &
Kalemkrarvan
610 West Ash Street, Suite 800
San Diego, California 92101
(619) 234-8585

Attorney for Defendants/Counter-claimants/Counter-Defendants

Stuart F. Clayton, Jr.
Georgia Bar No. __________

Lamberth, Bonapfel, Citelli &
Stokes, P.A.
Atlanta Financial Center
3343 Peachtree Road, N.E.
Suite 550
Atlanta, Georgia 30326-1009
(404) 262-7373

Attorney for Defendants/Counter-claimants/Counter-Defendants