**AGREEMENT GOVERNING BONDED CONTRACT PROCEEDS AND OTHER COLLATERAL**

THIS AGREEMENT GOVERNING BONDED CONTRACT PROCEEDS AND OTHER COLLATERAL ("this Agreement"), made this 16th day of May, 2001, by and among ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota corporation, and ST. PAUL MERCURY INSURANCE COMPANY, a Minnesota corporation (collectively "Surety"); AMERICAN RENOVATION AND CONSTRUCTION COMPANY, INC., a California corporation ("Principal"); ANTHONY P. DETHLOFF, ANTHONY J. JEMISON, KIMBERLY K. MCMAHON, FRANCIS N. TODD, IVAN L. VELASQUEZ, and BLANCHE RICHARDSON ("Individual Indemnitors"); and FIRST UNION NATIONAL BANK, a national banking association ("Collateral Agent").

WITNESSETH:

WHEREAS, Principal is engaged in the business of general construction;

WHEREAS, Principal has from time to time given certain bonds and Principal may desire or be required from time to time in the future in connection with its business to give certain bonds;

WHEREAS, Surety has executed or procured the execution of Bonds on behalf of Principal, and Surety may in the future execute or procure the execution of Bonds on behalf of Principal;

WHEREAS, Surety, Principal, and Indemnitors have entered an Agreement dated February 14, 2001, providing for, among other things financial assistance with and/or the takeover and/or completion of certain of Principal's Bonded Contracts by Surety and Compensated Indemnitors (the "Multi-Party Agreement") and advising Surety of Principal's financial difficulties, and Principal's inability to complete Bonded Contracts, and requesting Surety's assistance in completing Bonded Contracts;

WHEREAS, the Multi-Party Agreement contemplates the possible issuance of one or more Bonds by Surety on behalf of Principal in connection with the "Manatee Bay Project," the award of which is currently being pursued by Principal upon solicitation by the United States Navy;

WHEREAS, Indemnitors recognize that the financial assistance which may be made available to Principal in Surety's sole and absolute discretion is necessary for the business of Principal, and further recognize that each of them will benefit directly from Principal's ability to perform fully its bonded obligations, and desire to accommodate the financial, security, indemnity, exoneration, and other requirements of Surety as an inducement to Surety to extend such assistance to Principal, and have therefore agreed to be bound by this Agreement and have agreed to exercise their best efforts to permit and require Principal to honor and perform all of the terms of this Agreement; and

WHEREAS, the parties desire to enter into this Agreement in order to implement certain of the provisions of the Multi-Party Agreement and in order to amend and restate the Joint Control and Trust Account Agreement appearing as Appendix E thereto by eliminating said Appendix E

and substituting and replacing same with this Agreement, with all other provisions of and Appendices to the Multi-Party Agreement remaining in full force and effect as of the date it was executed.

NOW, THEREFORE, in consideration of the foregoing premises, and other and good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows with the express intention that nothing contained in this Agreement shall be construed or interpreted as expanding the scope of personal liability of the Indemnitors beyond that provided for in the Multi-Party Agreement (hereinafter identified), which Multi-Party Agreement shall control with respect to any provision hereof affecting the personal liability of Indemnitors to the extent that such provisions are in conflict with the provisions of the Multi-Party Agreement :

1. Definitions. Whenever the following terms are used herein, they will be defined as follows:

"Account Debtor" has the same meaning as is given that term in the UCC.

"Accounts" means and includes all of Indemnitors' now owned or hereafter acquired accounts with respect to Bonded Contracts; accounts receivable with respect to Bonded Contracts; fees generated from their Work under Bonded Contracts; and proceeds, including without limitation, all insurance proceeds, proceeds of any letter of credit on which any of Indemnitors is beneficiary, in each case including, but not limited to, accounts, accounts receivable, and proceeds that arise out of any and all Bonded Contracts and all forms of obligations whatsoever owing to Indemnitors under instruments and documents of title representing the foregoing; and all rights, securities, and guarantees with respect to each of the foregoing.

"Affiliate" means, with respect to any Person, any other Person or group acting in concert with respect of the Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under the common control with such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person or group of Persons, will mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise. None of Indemnitors is an Affiliate of Surety.

"Agreement" or "this Agreement" means all amendments, modifications, and supplements hereto and will refer to this Agreement Governing Bonded Contract Proceeds and Other Collateral as the same may be in effect at the time such reference becomes operative.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bonds" means any surety agreements, undertakings, or instruments of guarantee signed by Surety or signed by Surety on behalf of any Principal, whether executed before or after the execution of this Agreement, including, without limitation the Bonds described in the attached Exhibit A.

"Bonded Contract" means any contract referred to or described in any Bond issued on behalf of Principal.

"Business Day" means any day excluding Saturday, Sunday, and any day which is a legal holiday under the laws of the State of Tennessee or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"Cash Collateral Account" means the trust account referenced in Section 2 of this Agreement.

"Contract Balances" means all payments made, or to be made, to or on behalf of Principal pursuant to, arising out of, or relating to any Bonded Contract, including, without limitation, and whether earned and unpaid or to be earned, any increases in contract amounts.

"Contract Rights" means all of Indemnitors' Bonded Contracts, contract rights with respect to Bonded Contracts (including, but not limited to, rights under contracts for Work performed by any of Indemnitors, subcontracts, and contracts for the purchase of supplies), and rights under Bonded Contracts.

"Event of Default" means: (i) the failure of Indemnitors to perform or otherwise adhere to the terms and provisions of this Agreement; or (ii) any Event of Default under any of the Surety Credit Documents.

"Financial Statements" means balance sheets, income statements, and other financial data (whether of Principal, or any Indemnitor).

"Indebtedness" means any and all Surety Loss, and the payment and performance of all other obligations and undertakings now or hereafter owing to Surety without regard to whether such obligations are reflected by the execution of one or more promissory notes, but specifically including, without limitation, all obligations and undertakings imposed under the terms and conditions of any promissory note executed pursuant hereto on in connection herewith as well as under any Surety Credit Documents, as same may now or hereafter be amended, modified, replaced, extended, or renewed.

"Indemnitors" means American Renovation and Construction Company, a California corporation, Anthony P. Dethloff, a resident of the State of California, Anthony J. Jemison, a resident of the State of California, Kimberly K. McMahon, a resident of the State of California, Francis N. Todd, a resident of the State of California, Ivan L. Velasquez, a resident of the State of California, Blanche Richardson, a resident of the State of California, Solpac, Inc., a California corporation, d/b/a Soltek Pacific, and Soltek of San Diego, a California general partnership.

"Indemnity Agreements" means: (i) Agreement of Indemnity dated April 20, 1999 for the McDill AFB Project executed by Principal, Indemnitors Dethloff, Jemison, McMahon, Todd, Velasquez and Solpac, Inc.; (ii) Agreement of Indemnity dated February 17, 1999 for the Roosevelt Roads Project executed by Principal, Indemnitors Dethloff, Jemison, McMahon, Todd, Velasquez

and Solpac, Inc.; (iii) Agreement of Indemnity dated April 4, 2000 for the Mountain Home Project executed by Principal, Indemnitors Dethloff, Jemison, McMahon, Velasquez, Richardson and Solpac, Inc.; (iv) Agreement of Indemnity dated April 20, 1999 for the Redstone Project executed by Principal, Indemnitors Dethloff, Jemison, McMahon, Todd Valasquez and Solpac, Inc.; (v) Agreement of Indemnity dated April 12, 2000 for the Seymour Johnson Project executed by Principal, Indemnitors Dethloff, Jemison, McMahon, Valasquez, Richardson and Solpac, Inc.; (vi) Agreement for Indemnity dated April 12, 2000 for the Minot AFB Project executed by Principal, Indemnitors Dethloff, Jemison, Valasquez, McMahon and Solpac, Inc.; (viii) Agreement for Indemnity dated November 19, 1997 for the Malmstrom II Project executed by Principal, Indemnitors Dethloff Jemison, McMahon, Todd, Valasquez Solpac, Inc. and Soltek-San Diego, a California general partnership; (viii) Agreement for Indemnity dated April 6, 1998 for the Malmstrom III Project executed by Principal, Indemnitors Dethloff, Jemison, McMahon, Todd Velasquez Solpac, Inc. and Soltek-San Diego, a California general partnership; (ix) Agreement of Indemnity dated April 12, 2000 for the Malmstrom V Project executed by Principal, Indemnitors Dethloff, Jemison, Velasquez, McMahon Richardson Solpac, Inc. and Soltek-SanDiego, a California general partnership; (x) Agreement of Indemnity dated on or about February 14, 2001 for the Manatee Bay Project at Roosevelt Roads Naval Station executed by Principal, Indemnitors Dethloff, Jemison, McMahon, Velasquez, Richardson and Solpac, Inc.

"Lien" means any mortgage, security interest, lien, pledge, charge, proxy, voting trust or arrangement, encumbrance, lease, sublease, license, or other rights of use by another or other interest of any character whatsoever.

"Obligee" means any named party or parties appearing on any Bonds in whose favor the Bonds are issued, or such parties' successors and assigns.

"Person" means any entity, whether an individual, trustee, corporation, partnership, joint stock company, unincorporated organization, business association or firm, joint venture, or a government or any agent or instrumentality or political subdivision thereof.

"Principal" means American Renovation and Construction Company and any other Person that is designated as "Principal" under any Bond.

"Progress Payments" means those funds, net of Retentions, which would otherwise be immediately due Principal in the absence of a default under the Bonded Contract with respect to which periodic payments for completed Work are owed.

"Reserve" means a sum of money that must be set aside by Surety to pay actual or anticipated present or future liabilities under Bonds.

"Retentions" or "Retainage" means a specified percentage of contract proceeds periodically withheld by an Obligee to provide further security for Principal's performance of any Bonded Contract, and as such are payable to Principal only upon a clear demonstration of compliance with the terms of the Bonded Contract.

"Surety" means St. Paul Fire and Marine Insurance Company, a Minnesota corporation, and St. Paul Mercury Insurance Company, a Minnesota corporation, their respective successors, assigns and Affiliates.

"Surety Credit Documents" means: (i) the Bonds; (ii) Indemnity Agreements; (iii) the Multi-Party Agreement; (iv) this Agreement; (v) any UCC Financing Statement which lists any of Indemnitors as Debtor, and Surety or any of its Affiliates as Secured Party; (vi) Trust Agreement dated February 13, 2001, executed by Principal and Individual Indemnitors, which Trust Agreement is superseded in its entirety and replaced as Appendix E to the Multi-Party Agreement by this Agreement and, except for whatever transition, if any, must occur in connection with the transfer of account balances, is of no further force or effect; and (vii) all other documents and instruments heretofore or hereafter executed by or on behalf of Indemnitors or any of their Affiliates in connection therewith, and any and all modifications, amendments, substitutions, or other documents related thereto, whether executed by Indemnitors or any of their Affiliates.

"Surety Loss" means:

(a) All damages, loss, costs, reasonable attorneys', accountants', engineers', and consultants' fees (including all allocated costs of in-house attorneys, accountants, engineers, and consultants) and all expenses incurred in connection therewith, and liabilities (including without limitation any unsatisfied liabilities under Bonded Contracts or Bonds) which Surety may sustain, incur, or to which it may be exposed by reason of executing or procuring the execution of any Bond, or any other Bond(s) which may be already or hereafter executed on behalf of Principal, or renewal or continuation thereof; or which may be sustained or incurred by reason of making any investigation on account thereof, prosecuting or defending any action in connection therewith, obtaining a release, recovering, or attempting to recover any salvage in connection therewith, or enforcing by litigation or otherwise any of the provisions of the Surety Credit Documents, including, but not limited to:

(i) money judgments, amounts paid in settlement or compromise, the full amount of reasonable attorney and other professional fees incurred or paid by Surety, court costs and fees;

(ii) any loss which Surety may sustain or incur in connection with any contract, Bonded Contract, or Bond, whether that loss results from the activity of the Principal individually or as part of a joint venture, partnership, or other entity which has been or may be formed;

(iii) any loss which Surety may sustain or incur as a result of any actions taken by Surety upon information provided by any of Indemnitors; and

(iv) all Reserves; and

(v) any amounts that have been paid to Surety to be applied to Surety Loss that a court of competent jurisdiction determines constitute "preferences," within the meaning

of Section 547 of the Bankruptcy Code, and by reason thereof Surety is required to disgorge said amounts paid;

(b) Legal, accounting, and consulting fees (including allocated in-house fees) and related expenses reasonably incurred in connection with any application or submission by Principal for a proposal, bid, or other Bond, whether or not Surety decides to issue said Bond, including, but not limited to, reasonable legal fees incurred in the preparation and enforcement of the Surety Credit Documents.

"UCC" means the Uniform Commercial Code as in effect on the date hereof in the State of California as it may be amended from time-to-time; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of a security interest in any Collateral is governed by any state other than California, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection.

"Unbonded Contracts" means all of Indemnitors' contracts for Work performed by any of Indemnitors (including, but not limited to, associated subcontracts and contracts for the purchase of supplies), excluding Bonded Contracts.

"Work" means the general construction and construction management services required by any Bonded Contract, whether completed or partially completed, of any of Indemnitors, and includes all other labor, materials, equipment, and services provided or to be provided by Indemnitors to fulfill any of Indemnitors' obligations.

"Zero Balance Account" means the general checking account referenced in Section 13 of this Agreement.

Any accounting terms used in this Agreement which are not specifically defined will have the meanings customarily given them in accordance with Generally Accepted Accounting Principles.

All other terms contained in this Agreement will, unless the context indicates otherwise, have the meanings provided for by the UCC to the extent the same are defined therein.

Any of the terms defined in this Section 1 may be used in the singular or the plural, depending on the reference.

2. Establishment of Cash Collateral Account. Pursuant to letters of direction, or by other means satisfactory to Surety in Surety's sole and absolute discretion, including, but not limited to the manner described in Section 5 of this Agreement, Principal will cause all Contract Balances, proceeds of Accounts, proceeds of Contract Rights and contract proceeds under Bonded Contracts to be deposited in a separate trust account, account no. 6072000815 (the "Cash Collateral Account") in the name and under the exclusive control of Collateral Agent; no proceeds derived from Unbonded Contracts will be deposited in the Cash Collateral Account. The Cash Collateral Account will be maintained by Collateral Agent and titled "FUNB-Collateral Agent for St. Paul."

Collateral Agent will hold all amounts in the Cash Collateral Account as security for any and all Surety Loss and to be applied in accordance with the terms and provisions of this Agreement.

3. Security; Lien on Cash Collateral Account; Other Collateral. Principal grants to Collateral Agent, for the benefit of Surety in accordance with the terms of this Agreement and the Surety Credit Documents, a Lien on, and a continuing security interest in, all funds deposited in the Cash Collateral Account as security for any Surety Loss. Principal acknowledges that any interest it may have in the funds deposited in the Cash Collateral Account is subject to the foregoing Lien and security interest of Surety, which Liens and security interests will continue until all obligations of Principal to Surety under the Surety Credit Documents, or otherwise, have been satisfied, and Collateral Agent has been notified in writing of such satisfaction by Surety.

As additional security for the repayment of all of Indebtedness, including, without limitation, all Surety Loss, Principal hereby grants, conveys, assigns and sets over to First Union National Bank as Collateral Agent for Surety a first priority security interest in: (a) the Bonded Contracts and receivables, deferred payments, retained percentages, and proceeds from claims filed under the Contract Disputes Act, 41 USC §§601, et. seq., arising from or in connection with Bonded Contracts, including, but not limited to, all Contract Balances with respect to the Bonded Contracts; all rights, actions and causes of action that Principal and Indemnitors may have or acquire relating to or on account of, any subcontract or the Bonded Contracts (including those relating to extra work or materials supplied in connection therewith) and/or against any subcontract with any Person furnishing or agreeing to furnish or supply vehicles, labor, supplies, machinery, or other equipment in connection with or on account of the Bonded Contracts, and/or against any surety or sureties of any such subcontractor, laborer, or other Person; (b) and all supplies, tools, plant, materials, inventory and equipment (whether completely manufactured or not), wherever located, which have been or hereafter may be purchased, used, or acquired for use, entirely or partly, in connection with or to be incorporated into the subject matter of the Bonded Contracts; and (c) all subcontracts relating to the Work under the Bonded Contracts which have been or hereafter may be made, together with the materials embraced therein, and all surety bonds securing the performance of, or the discharge of obligations incurred in connection with, such subcontracts.

As further security for the prompt satisfaction of all Indebtedness, Principal and Indemnitors hereby assign, transfer and set over to Surety all right, title, and interest in and to, and grant Surety, a Lien on and a security interest in, all amounts that may be owing from time to time by Surety to Principal and Indemnitors in any capacity, including, without limitation, any balance or share belonging to such Principal or Indemnitor of any deposit or other account with Surety, which Lien and security interest will be independent of any right of setoff which Surety may have.

4. Notice of Deposits. No later than five (5) days after being requested to do so, Principal will provide Surety with an accounting of all deposits made in the Cash Collateral Account including, but not limited to, identifying the Bonded Contracts and Contract Rights from which the proceeds have derived, any contracting parties or Account Debtors who have not paid their contract proceeds according to any Bonded Contract, any contract subject to a Contract Right, or any Account, and the identity of the last known holder of any Contract Balances, proceeds of Accounts, proceeds of any Contract Right, or cash collateral not deposited into the Cash Collateral