IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **AMERICAN RENOVATION AND CONSTRUCTION COMPANY,** Plaintiff, | |
| **ST. PAUL FIRE AND MARINE INSURANCE COMPANY,** Intervenor Plaintiff, | |
| v. | **Case No. 03-1798C** (Chief Judge Damich) |
| **CLASSICAL FINANCIAL SERVICES, LLC,** Intervenor Plaintiff, | |
| v. | |
| **UNITED STATES,** Defendant. | |

**INTERVENOR'S COMPLAINT**
**(ST. PAUL FIRE & MARINE INSURANCE COMPANY)**

COMES NOW the Intervenor, St. Paul Fire & Marine Insurance Company ("St. Paul" or "Surety" or "Intervenor"), by counsel, pursuant to the Court's Order dated July 13, 2005 (Docket #46) granting St. Paul's motion to intervene under RCFC 24(a), and as its Intervenor's Complaint in the captioned matter states as follows:

## JURISDICTION AND PARTIES

1. This Court has jurisdiction over this matter pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§601-613, and the Tucker Act, 28 U.S.C. §1491, et seq.

2. Plaintiff American Renovation and Construction Company ("ARC") is a corporation organized and existing under the laws of the State of California, with its principal place of business located in Encinitas, California.

3. The Defendant is the United States of America, acting through its agency, bureau, instrumentality and/or agent, the Department of the Air Force (the "Air Force" or the "Government").

4. The Intervenor, St. Paul, is a corporation duly authorized to engage in the business of executing surety bonds in the State of Florida.

## BACKGROUND FACTS

5. On March 31, 1999, ARC entered into Contract Number F08602-99-CK006 (the "Contract") with the Government to perform certain construction work on a project known as: Construct JNCO Family Housing Units, Phases III and IV, MacDill AFB, Florida (the "Project").

6. On April 20, 1999, St. Paul executed performance and payment bonds, Bond No. KA6329 (the "Bonds"), as a condition of the Contract.

7. On April 20, 1999, "for the purpose of inducing [St. Paul] to become surety on the [Bond]," ARC, as the Bond Principal, and ARC's indemnitors executed an Agreement of Indemnity relating to the Contract.

8. On July 29, 2002, Defendant issued a Contracting Officer's Final Decision terminating ARC's Contract for alleged default on the Project.

9. On August 7, 2002, St. Paul entered into a Takeover Agreement with the Government to complete the Project.

10. Pursuant to numbered paragraph 1 of the Takeover Agreement, "[t]he term 'Contractor' as used in the Contract shall be deemed after the effective date of this Agreement [August 7, 2002] to refer to the Surety rather than American Renovation & Construction Company."

11. St. Paul incurred costs and expenses relating to the performance of work on this Project.

12. On July 28, 2003, Plaintiff filed the Complaint, Docket 1, in this action. A true and correct copy of the Complaint is attached as Exhibit 1 hereto.

13. On or about May 4, 2005, Classical filed an Intervenor's Complaint, Docket 42, in this lawsuit.

**COUNT I**
**(St. Paul's Equitable Subrogation Rights)**

14. St. Paul incorporates by reference the allegations contained in numbered paragraphs 1 through 13 of this Complaint as if fully set forth herein.

15. St. Paul incorporates by reference the allegations contained in ARC's Complaint in this action, Docket No. 1.

16. St. Paul executed Miller Act Performance and Payment Bonds as a condition of the Contract between ARC and the Government, pursuant to 40 U.S.C. §§270a, *et seq*. (the "Miller Act").

17. The Government declared ARC to be in default under the Contract.

18. St. Paul completed the Contract pursuant to its obligations under the Performance Bond.

19. St. Paul incurred costs and expenses to complete the Contract pursuant to its obligations under the Performance Bond.

20. St. Paul made payments pursuant to its obligations under the Payment Bond.

21. St. Paul's payments, costs and expenses pursuant to its obligations under the Performance and Payment Bonds, exceeded any funds St. Paul received for performing these obligations.

22. St. Paul is subrogated to ARC's rights to receive funds payable by the Government under the Contract, to include all of ARC's claims and causes of action asserted in this litigation.

23. St. Paul is subrogated to the Government's rights to set off claims against ARC, if any, against funds remaining under the Contract.

24. St. Paul's subrogation rights date back to April 20, 1999, the date when St. Paul executed the Bonds.

WHEREFORE, Intervenor St. Paul respectfully requests that this Court enter judgment in favor of St. Paul on Count I of this Complaint and award St. Paul, as a first priority, all remedies, damages, and any other relief otherwise recoverable by ARC against the Government in this litigation, plus attorney's fees, costs and such other relief as the Court deems proper.

**COUNT II**
**(St. Paul's Indemnification and Assignment Rights)**

25. St. Paul incorporates by reference the allegations contained in numbered paragraphs 1 through 21 of this Complaint as if fully set forth herein.

26. ARC and others executed an Agreement of Indemnity relating to the Contract and the Bond, for the purpose of inducing St. Paul to become surety on the Bonds.

27. Pursuant to the Agreement of Indemnity, ARC assigned to St. Paul all of its rights to the funds remaining under the Contract and all of its claims and actions and causes of action, including those set forth in ARC's Complaint in this litigation.

28. ARC's assignment of rights to St. Paul was effective as of April 20, 1999, the date of the Agreement of Indemnity.

WHEREFORE, Intervenor St. Paul respectfully requests that this Court enter judgment in favor of St. Paul on Count II of this Complaint and award St. Paul, as a first priority, all remedies, damages, and any other relief otherwise recoverable by ARC against the Government in this litigation, plus attorney's fees, costs and such other relief as the Court deems proper.

**COUNT III**
**(St. Paul's Contractual Rights)**

29. St. Paul incorporates by reference the allegations contained in numbered paragraphs 1 through 21 of this Complaint as if fully set forth herein.

30. Following the Government's termination of ARC's Contract for default, St. Paul entered into a Takeover Agreement with the Government.

31. The Takeover Agreement *inter alia* incorporates the terms and conditions of the Contract and the Performance Bond.

32. St. Paul incurred costs and expenses to perform its obligations under the Takeover Agreement.

33. St. Paul's costs and expenses to perform its obligations under the Takeover Agreement exceeded funds St. Paul received under the Takeover Agreement.

34. There remains a contract balance payable by the Government to St. Paul under the Takeover Agreement.

WHEREFORE, Intervenor St. Paul respectfully requests that this Court enter judgment in favor of St. Paul on Count III of this Complaint and award St. Paul all contractual remedies, damages, and any other relief against the Government pursuant to the Takeover Agreement, to include attorney's fees, costs and such other relief as the Court deems proper.

Respectfully submitted this 23rd day of August 2005.

ST. PAUL FIRE & MARINE INSURANCE COMPANY

By Counsel:

ROBERT G. WATT
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
Ph: (703) 749-1000
Fax: (703) 893-8029
rwatt@wthf.com

Of Counsel:
HARISH C. MIRCHANDANI
Watt, Tieder, Hoffar & Fitzgerald, LLP
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
Ph: (703) 749-1000
Fax: (703) 893-8029
hmirchan@wthf.com

CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2005, a copy of the foregoing Intervenor's Complaint (St. Paul Fire & Marine Insurance Company), was served on the following, via Federal Express:

Michael N. O'Connell, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division, Department of Justice
8th Floor, 1100 L Street, N.W.
Washington, DC 20530

and

T.J. Frasier, Esq.
The Robertson Group
5216 S.W. 91 Drive
Gainesville, FL 32608

Robert G. Watt

# EXHIBIT 1

#058280

ORIGINAL

ECF

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

FILED
JUL 2 8 2003
U.S. COURT OF
FEDERAL CLAIMS

AMERICAN RENOVATION AND CONSTRUCTION COMPANY,

Plaintiff,

v.

THE UNITED STATES OF AMERICA

Defendant

Case No. 03-1798C

## COMPLAINT

COMES NOW the Plaintiffs, American Renovation & Construction Company ("ARC" or "Plaintiff"), by counsel, and for their Complaint against the Defendant, United States of America, allege the following:

## JURISDICTION AND PARTIES

1. This Court has jurisdiction over this matter pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§601-613, and the Tucker Act, 28 U.S.C. §1491, et seq.

2. Plaintiff ARC is a corporation organized and existing under the laws of the State of California, with its principal place of business located in Encinitas, California.

3. The Defendant is the United States of America, acting through its agency, bureau, instrumentality and/or agent, the Department of the Air Force (the "Air Force" or the "Government").

4. The Government terminated for default Contract No. F08602-99-CK006 by a Contracting Officer's Final Decision, dated July 29, 2002 and received by ARC on the same date. Accordingly, this Complaint is timely filed by ARC within one year of receipt of the termination for default.

## FACTS

**Bid Solicitation and Contract**

5. On or about January 22, 1999, the Government issued Bid Solicitation No. F0862-99-R0003 for a project known as: Construct JNCO Family Housing Units, Phases III and IV, MacDill AFB, Florida (the "Project"). The Project generally involved the construction of family housing units at the MacDill Air Force Base in two phases: the first phase (Phase III) was specified as a basic Contract requirement, with optional requirements for additional units, and the second phase (Phase IV) was contingent on the exercise of options by the Government.

6. The Bid Solicitation specified, *inter alia*, that the Project duration to perform the basic Contract requirements (Phase III) would be 365 days, subject to extension(s) of time as specified if the Government awarded ARC any of the optional requirements, including Phase IV of the Project.

7. On or about February 9, 1999, ARC attended a pre-proposal conference and site visit. In the minutes of the pre-proposal conference and site visit, the Contracting Officer confirmed, *inter alia*:

a. that Phases III and IV, if awarded, and any other optional requirements, would be performed sequentially, stating that

award of Phase IV by the Government "extends the performance an additional 365 calendar days and likewise award of additional requirements in line item 0004 extends performance as stated;" and

b. that the successful bidder would have no design responsibility on the Project, stating that "[t]his is a 100% designed project."

8. On or about March 4, 1999, in response to the Bid Solicitation, and in reliance on the plans and specifications provided by the Government and the Contracting Officer's statements at the pre-proposal conference and site visit, ARC submitted a bid to perform the Project for the lump sum amount of $6,233,629.00 for the basic requirement, plus additional lump sum amounts for each of the optional requirements, if awarded by the Government.

9. On or about March 31, 1999, the Government accepted ARC's bid as the lowest responsible and responsive bid.

10. On or about March 31, 1999, ARC entered into Contract Number F08602-99-CK006 with the Government in the base amount of $6,233,629.00 (the "Contract").

11. The Contract included, *inter alia*, the following standard form clauses set forth in the Federal Acquisition Regulations ("FAR"):

a. 52.211-10, "Commencement, Prosecution and Completion of Work" (APR 1984);

b. 52.211-13, "Time Extensions" (APR 1984);

c. 52.233-1, "Disputes" (DEC 1998);

d. 52.243-4, "Changes" (AUG 1987);

e. 52.249-2, "Termination for Convenience of the Government (Fixed-Price)" (SEP 1996) – Alternate I (SEP 1996);

f. 52.249-10, "Default (Fixed-Price Construction)" (APR 1984).

12. Under FAR 52.211-10, the Contract specified a duration of 365 calendar days for the basic requirements, plus additional calendar days as specified if any of the optional requirements under Phase III of the Project were awarded to ARC, plus an additional duration of 365 days if Phase IV of the Project was awarded to ARC, plus additional calendar days as specified if any of the optional requirements under Phase IV of the Project were awarded to ARC.

13. Under FAR 52.249-10(b), the Contract permitted the Government to terminate ARC's right to proceed, provided just cause existed.

14. FAR 52.249-10(c) provided a remedy in the event the Government wrongfully terminated ARC for default, stating:

> If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

<u>Contract Performance</u>

15. The Government issued a Notice to Proceed with Phase III of the Project on or about August 11, 1999. Pursuant to the Contract, ARC was required to substantially complete Phase III of the Project by August 11, 2000.

***Contract Modifications***

16. Between August 11, 1999 and March 31, 2000, the Government issued Contract Modification Nos. 1 through 8 whereby, *inter alia*, the Government and ARC mutually agreed to extend the Contract completion date to June 5, 2001.

17. On or about March 31, 2000, the Government exercised its option to award ARC Phase IV of the Project, including one of the optional requirements under Phase IV. Accordingly, the Contract allowed ARC an additional duration of 395 calendar days, or until July 5, 2002, to substantially complete the Project.

18. By unilateral Contract Modification No. 9, however, the Government directed ARC to substantially complete the Project scope of work, as modified, by August 24, 2001. The Government provided no justification for reducing the Contract-mandated duration by more than ten (10) months.

19. Thereafter, the Government and ARC executed additional Contract Modifications for direct cost increases due to Government-directed changes in ARC's scope of work. The parties, however, agreed to defer negotiation of related time extensions and delay damages until a later date, pending ARC's submission of a consolidated request for equitable adjustment.

20. By unilateral Contract Modification No. 13, the Government purported to extend the Contract completion date by 60 calendar days, but in fact indicated a revised completion date of August 4, 2001.

21. By unilateral Contract Modification No. 15, the Government revised the Contract completion date to July 1, 2002, in response to ARC's January 2001 request for equitable adjustment.

***Design Deficiencies***

22. The Contract required ARC to construct one model of each type of housing unit, for the primary purpose of enabling the Contracting Officer to select material finishes and color.

23. ARC also reasonably expected to establish the learning or experience curve for the buildings during construction of the model units.

24. Notwithstanding express and implied representations in the Contract that the Project was "100% designed," ARC uncovered deficiencies in almost every aspect of the design during construction of the model units.

25. Government representatives acknowledged contemporaneously that the Project was severely deficient and the Government directed ARC to design-build the Project, using the Contract documents "for reference only."

26. Several of the design deficiencies that were uncovered during construction of the model units are exemplified by numerous Requests for Information ("RFI") that ARC issued on the Project.

27. The cumulative impact of the design deficiencies was exacerbated by the Government's failure to respond timely to many of the RFIs. In some instances, the Government responded several months after ARC issued the RFIs.

28. In addition to the design issues that were addressed specifically in RFIs and other correspondence, the Government and ARC resolved a number of design errors through as-built field changes to the model units.

29. The RFIs and field changes impacted almost every trade involved in the construction of each of the model units.

30. The process of redesigning the Project in the field, as the construction work progressed, caused numerous disruptions on a daily basis, resulting in significant delays and increased costs.

31. The Contract specified, *inter alia*, the gross and net areas of each type of housing unit included in the Project scope of work. The areas, as specified, were consistent with statutory size requirements for Air Force housing units.

32. ARC relied reasonably on the express Contract representations regarding the size of the housing units in preparing its bid estimate for the work.

33. The actual size of the housing units was significantly greater than the specified gross areas and the applicable statutory limits, causing ARC to expend additional time and money to perform the increased scope of work.

34. The change in the nature of the Project, from "100% designed" to "design-build" type construction precluded ARC from, *inter alia*, progressing the work in an efficient and productive manner and made it especially difficult for ARC to retain and/or hire qualified workers in adequate numbers.

35. The loss of productivity, proximately caused due to the change by the Government in the nature of the Project to design-build type construction,

was exacerbated by a severe shortage of construction labor in the Tampa Bay area, where the Project is located.

36. ARC notified the Government of the increased costs and delays, proximately caused by the Government's directive to design-build the Project and compounded by the labor shortage in the area, as well as the measures ARC was taking to mitigate some of the delays and damages.

***Change in Site Access Procedures***

37. On or about September 13, 2001, the Government issued a directive, subsequently incorporated in unilateral Contract Modification No. 16, imposing "stricter security requirements" for personnel and materials to access the Project site.

38. ARC notified the Government of the impact due to the heightened security requirements, including a significant loss of manpower, increased wage rates, loss of labor productivity, increased material procurement costs, and additional delays.

**ARC's Requests for Equitable Adjustment**

39. In or about January 2001, ARC submitted to the Contracting Officer a request for equitable adjustment of the Contract, including a time extension by 210 days and additional compensation, primarily due to deficiencies in the design furnished by the Government.

40. Following an audit of ARC's costs by the DCAA, the Contracting Officer made a settlement offer to ARC, by letter dated December 10, 2001. In the December 10, 2001 letter, the Contracting Officer allowed for ARC to

supplement its claim for additional delays and costs incurred since the January 2001 submission of ARC's request for equitable adjustment and to provide an acceptable schedule and delay analysis using the Critical Path Method ("CPM") of scheduling.

41. By letter dated July 26, 2002, ARC submitted its amended request for equitable adjustment, including additional delays and costs incurred since the January 2001 submission of ARC's request for equitable adjustment, as well as a CPM schedule and delay analysis, as requested by the Contracting Officer. In the amended submission, ARC requested, *inter alia*, compensation for 529 calendar days of delay caused by the Government and an extension of the Contract completion date until February 4, 2003.

**Cure Notice, Termination and Surety Takeover**

42. Recognizing the financial burden on ARC due to uncompensated delays and increased costs attributable to the Government, ARC's performance and payment bond surety, St. Paul Fire and Marine Insurance Company ("St. Paul" or the "Surety"), took measures to protect its own interests and the interests of the Government, by providing financial and management assistance to ARC, starting in July 2001.

43. On or about December 10, 2001, almost one year after ARC submitted its request for equitable adjustment, the Government Contracting Officer made an offer to settle ARC's request for a fraction of ARC's delay damages.

44. Immediately following the Contracting Officer's settlement offer, St. Paul offered to take over the Project pursuant to a proposed voluntary default by ARC and St. Paul forwarded to the Government the draft of a proposed Takeover Agreement.

45. The Government failed to respond meaningfully to St. Paul's proposed Takeover Agreement in a timely manner.

46. Approximately three months after St. Paul's proposal to take over the Project, the Government issued a "Cure Notice" to ARC, dated March 12, 2002, stating that the Government may terminate for default within 10 days after receipt of the cure notice.

47. ARC and St. Paul responded jointly to the cure notice, in writing, *inter alia* urging the Government to expedite execution of the proposed Takeover Agreement. Representatives of ARC and St. Paul also met with Government representatives to discuss the cure notice and St. Paul's proposed Takeover Agreement.

48. On the morning of July 29, 2002, the Government received delivery of ARC's amended request for equitable adjustment, establishing ARC's entitlement to additional time extensions and compensation for increased costs on the Project.

49. On the afternoon of July 29, 2002, the Government issued a Contracting Officer's Final Decision, terminating the Contract for default. The Final Decision was hand delivered to ARC on the same day.

50. As of July 29, 2002, ARC had established its entitlement to a time extension until February 4, 2003, supported by detailed schedule and delay analysis, documentation of increased costs, and other exhibits. In its transmittal of the request for equitable adjustment, ARC also proposed a meeting with the Government Contracting Officer to discuss the issues addressed in the request and achieve a negotiated settlement of the request for equitable adjustment.

51. The Government failed to meaningfully review ARC's request for equitable adjustment prior to terminating the Contract.

52. ARC fulfilled all of its material obligations under the Contract and performed in a proper manner.

53. On or about August 1, 2002, the Government executed a Takeover Agreement with St. Paul, as proposed earlier by St. Paul in December 2001.

**COUNT I**

**(Breach of Contract – Wrongful Termination)**

54. ARC incorporates by reference the allegations contained in paragraphs 1 through 53 of this Complaint as if set forth fully herein.

55. Pursuant to the Contract and applicable law, the Government had a duty and obligation to, *inter alia*:

a. timely provide complete and accurate plans and specifications for the Project;

b. administer, coordinate and manage the Contract in a competent, proper and timely manner consistent with the terms and conditions of the Contract; and

c. not unreasonably delay, interrupt, obstruct, or otherwise hinder ARC's performance of its Contract work.

56. The Government failed to perform all of its obligations under the Contract and applicable law and materially breached the Contract by, *inter alia*:

a. failing to timely provide ARC with complete and accurate plans and specifications for the Project;

b. unreasonably withholding and/or delaying approval or response to ARC's submittals, RFIs and other submissions;

c. failing to grant time extension(s) for changes, excusable and compensable delays, extra work and other unforeseen matters beyond the control and without the fault of ARC;

d. failing and/or refusing to make reasonable efforts to promptly and equitably resolve disputes and change order proposals;

e. delaying and/or interfering with ARC's performance of the Contract work;

f. failing to exercise reasonable discretion in its decision to terminate the Contract; and

g. failing to otherwise honor the terms and conditions of the Contract.

57. The Government's material breaches of its contractual obligations extinguished any contractual right it may have had to terminate ARC's Contract for default. Accordingly, the default termination by the Government was wrongful.

58. As a direct and proximate result of the Government's wrongful termination of the Contract, ARC has sustained substantial damages. Moreover, ARC's performance of the Contract work was delayed, disrupted and otherwise impacted as a direct and proximate result of the Government's wrongful termination and material breaches of the Contract.

WHEREFORE, ARC respectfully requests that this Court enter judgment against the Government on Count I of this Complaint, set aside the termination for default, convert said termination into a termination for Convenience of the Government, and award ARC all relief provided under the Contract and applicable laws and regulations, to include attorney's fees, costs and such other relief as the Court deems proper.

**COUNT II**

**(Wrongful Default Termination)**

59. ARC incorporates by reference the allegations contained in paragraphs 1 through 58 of this Complaint as if set forth fully herein.

60. The Government wrongfully terminated ARC when the Government, *inter alia*:

a. failed to timely provide ARC with complete and accurate plans and specifications for the Project;

b. unreasonably withheld and/or delayed approval or response to ARC's submittals, RFIs and other submissions;

c. failed to grant time extensions for changes, excusable and compensable delays, extra work and other unforeseen matters beyond the control and without the fault of ARC;

d. failed and/or refused to make reasonable efforts to promptly and equitably resolve disputes and change order proposals;

e. delayed and/or interfered with ARC's performance of the Contract work;

f. failed to exercise reasonable discretion in its decision to terminate the Contract; and

g. failed to otherwise honor the terms and conditions of the Contract.

61. The acts and/or omissions of the Government set forth above also caused ARC to suffer excusable and compensable delays.

62. As a direct result of the Government's acts and/or omissions, ARC sustained substantial damages. Moreover, ARC's performance of the Contract Work was delayed, disrupted and otherwise impacted as a direct result of the Government's acts and/or omissions.

WHEREFORE, ARC respectfully requests that this Court enter judgment against the Government on Count II of this Complaint, set aside the termination for default, convert said termination into a termination for Convenience of the Government, and award ARC all relief provided under the Contract and applicable laws and regulations, to include attorney's fees, costs and such other relief as the Court deems proper.

**COUNT III**

**(Wrongful Termination)**

63. ARC incorporates by reference the allegations contained in paragraphs 1 through 62 of this Complaint as if set forth fully herein.

64. Notwithstanding the Government's acts, omissions and/or breaches of Contract described above, as of July 29, 2002, ARC had the ability to complete, and planned to complete, the remaining Contract work by the unadjusted Contract substantial completion date, as indicated in ARC's amended request for equitable adjustment.

65. Notwithstanding ARC's ability to complete the remaining Contract work in accordance with the Contract requirements, the Government terminated the Contract for default. Accordingly, the Government's termination of the Contract for default was wrongful.

66. As a direct and proximate result of the Government's wrongful termination of the Contract, ARC has sustained substantial damages.

WHEREFORE, ARC respectfully requests that this Court enter judgment against the Government on Count III of this Complaint, set aside the termination for default, convert said termination into a termination for Convenience of the Government, and award ARC all relief provided under the Contract and applicable laws and regulations, to include attorney's fees, costs and such other relief as the Court deems proper.

Respectfully submitted this 28th day of July, 2003.

AMERICAN RENOVATION AND
CONSTRUCTION COMPANY

By Counsel:

Robert G. Watt
Watt, Tieder, Hoffar & Fitzgerald, LLP
7929 Westpark Drive, Suite 400
McLean, Virginia 22102
Ph: (703) 749-1000
Fax: (703) 893-8029
rwatt@wthf.com